295 N.J. Super. 594 (1996)
685 A.2d 966
JOEL BLOOM, M.D., STANLEY SCHATZMAN, M.D., PLAINTIFFS, AND DONALD STAVIS, M.D., PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
CLARA MAASS MEDICAL CENTER, BELLEVILLE RADIOLOGY ASSOCIATES, P.A., BARRY H. MARTIN, M.D., DEFENDANTS-RESPONDENTS, AND JAMES A. HEIMANN, M.D., DEFENDANT-RESPONDENT/CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 1996.
Decided December 13, 1996.
*596 Before Judges SHEBELL, BAIME, and BRAITHWAITE.
Laura LeWinn argued the cause for appellant/cross-respondent.
David Posner argued the cause for respondent Clara Maass Medical Center (Smith, Kramer, Morrison, Posner & Kenlan, attorneys; Mr. Posner and Edward Kenlan, Jr., on the brief).
Terry Thornton argued the cause for respondent Belleville Radiology Associates (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Ms. Thornton, on the brief).
Jonathan Clemente argued the cause for respondent/cross-appellant James A. Heimann, M.D. (Clemente, Dickson & Mueller, attorneys; Mr. Clemente and Joseph Dickson, of counsel and on the brief; Marilyn Van Houten, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The principal question presented in this case is whether Donald Stavis, a medical doctor specializing in radiology, was unlawfully denied hospital staff privileges by Clara Maass Medical Center (hereinafter Clara Maass). Clara Maass revoked Dr. Stavis' privileges when he refused to sign an employment contract with Dr. James Heimann, the chairperson of its radiology department. Under Clara Maass' closed-staff policy, Dr. Heimann had an exclusive contract to furnish radiology services to the hospital and *597 only those radiologists hired by him were entitled to staff privileges. Dr. Stavis contends that the protections provided by the hospital's bylaws should have been triggered and that he was denied due process. Other issues pertain to whether Dr. Stavis owned an equity interest in Belleville Radiology Associates (hereinafter Belleville Associates) or was otherwise entitled to a share of its accounts receivable following his resignation, and whether Dr. Barry Martin or Dr. Heimann breached his fiduciary duty in his administration of the medical practice.
We hold that Clara Maass' decision to enter an exclusive contract with Dr. Heimann for the provision of radiological services was reasonably related to an appropriate public health objective and did not unfairly deprive Dr. Stavis of a constitutionally protected right. We also find substantial credible evidence in the record supporting the conclusion that Dr. Stavis owned no equity interest in Belleville Associates and was not entitled to a share of accounts receivable following his resignation. Finally, we conclude that neither Dr. Martin nor Dr. Heimann breached a fiduciary duty nor an implied covenant of good faith and fair dealing.

I.
Donald Stavis, Joel Bloom, and Stanley Schatzman, all medical doctors specializing in radiology, brought this action in the Chancery Division, claiming that Clara Maass unlawfully revoked their staff privileges in violation of the hospital's bylaws. Plaintiffs sought an order restraining Clara Maass and Dr. Heimann from interfering with their staff privileges. They also demanded a declaratory judgment that the exclusive contract between Clara Maass and Dr. Heimann for the provision of radiological services was void, and that they were lawful shareholders, directors and officers of Belleville Associates. The three doctors further sought monetary damages. In their amended complaint, plaintiffs additionally claimed that Belleville Associates and Dr. Martin breached their contractual duty to distribute corporate earnings. They *598 further asserted that Dr. Heimann and Dr. Martin breached an implied covenant of good faith and fair dealing. Dr. Heimann filed a counterclaim in which he asserted that plaintiffs had tortiously interfered with his prospective economic advantage.
The Chancery Division granted Clara Maass' motion for summary judgment. Following a protracted nonjury trial, Judge Simon rendered an extensive oral opinion in which he rejected all but one of plaintiffs' claims. The judge ordered Dr. Heimann to share with plaintiffs a $25,000 stipend paid to him by Clara Maass in return for his administrative duties. The judge found no merit in the counterclaim. Dr. Stavis appeals. Dr. Heimann cross-appeals. We affirm the Chancery Division's judgment.
The thirty-seven day trial generated transcripts exceeding several thousand pages. We recount only the essential facts. This case emanates from a long-festering acrimonious dispute pertaining to the management of Clara Maass' radiology department and the ownership of Belleville Associates. The issues presented are rooted in the history of both entities and the way in which they have intersected over the years. Because of the interplay between the two, our recitation of the facts is necessarily somewhat disjointed.
We begin with a brief description of Clara Maass. Clara Maass is a nonteaching community hospital. Its departments provide services exclusively to the hospital's patients. Each department bills the patients directly and is "close-staffed," meaning the chairperson of the department has an exclusive agreement to provide services to the hospital and hire physicians based on need. No other doctors are accorded staff privileges. At the time of trial, all of Clara Maass' departments were close-staffed, and all but one chairperson had a written contract with the hospital.[1]
Belleville Associates had its genesis in the solo radiology practice of Dr. Joseph Israel. Dr. Israel was appointed chairperson of *599 Clara Maass' radiology department in 1966. In 1968, Dr. James Stovin joined the practice, and approximately one year later, Dr. Israel established two corporations  "Joseph Israel, M.D., P.A.," which administered the radiology department at Clara Maass, and "Joseph Israel and James Stovin, M.D., P.A." (hereinafter I & S) which administered out-patient services. The name of the hospital corporation, "Joseph Israel, M.D., P.A." was later changed to Belleville Associates, and the office corporation, I & S, was dissolved in 1990. Dr. Israel owned all of the stock of the hospital corporation, and Dr. Israel and Dr. Stovin each owned fifty percent of the shares of the office corporation. In 1970, Dr. Martin joined the practice. Two years later, he paid approximately $13,000 to become an equal shareholder with Dr. Israel and Dr. Stovin in I & S.
Dr. Israel continued as chairperson of Clara Maass' radiology department until 1977, when he was succeeded by Dr. Martin. Although Dr. Israel had been given written contracts to serve as chairperson each year, Dr. Martin's agreement was merely verbal. After Dr. Martin became chairperson, Dr. Israel transferred to him ninety percent of his shares of the hospital corporation. In 1984, Dr. Israel transferred the remainder of the stock to Dr. Martin, as well as his thirty percent interest in I & S.
Dr. Schatzman joined Belleville Associates in 1977. Dr. Bloom joined the group in 1978. Dr. Stavis commenced his association with Belleville Associates in 1982. All three testified they were told by Dr. Martin during their initial interview that they would ultimately become partners in the practice.
Dr. Schatzman claimed that Dr. Martin represented he would become a partner after five years. However, he admitted that he never asked Dr. Martin for shares of stock after the completion of the five year period. Dr. Schatzman also acknowledged that he knew Dr. Israel owned most, if not all, of the stock in the hospital corporation and that he never questioned Dr. Martin as to the ownership of these shares after Dr. Israel retired.
*600 Dr. Bloom testified that he requested a written contract when he was initially interviewed by Dr. Martin. Dr. Martin refused and instead gave him a page of his handwritten notes. The unsigned and undated notes were produced at trial. They specify Dr. Bloom's salary, benefits, percentage of profits for the first five years, and in cryptic fashion, state "[f]ull partnership thereafter." Dr. Bloom claimed that he was promised he would become a partner in both corporations after five years, that he would be required to purchase shares of the office corporation after two years, and that it would not be necessary for him to buy into the hospital corporation. According to Dr. Bloom, Dr. Martin refused to sell him shares in the office corporation after the two year period despite his repeated requests.
Dr. Stavis testified that when he was initially interviewed by Dr. Martin he was told he would ultimately become a full partner. Although Dr. Stavis was aware that two corporate entities were involved, he otherwise lacked any knowledge pertaining to the business structure of the medical group. Because of the "collegial nature" of the association, Dr. Stavis never requested a written contract and did not ask for any tangible indicia of partnership status.
Dr. Martin's testimony was markedly different. According to Dr. Martin, he never represented to any of the plaintiffs that they would become equity owners in the hospital corporation. Instead, each was told that he would be entitled to an equal share of profits after serving a probationary period.
Dr. Martin recalled that he told Dr. Schatzman about the business structures of the hospital and office corporations. The question of equity ownership was never discussed. According to Dr. Martin, Dr. Schatzman was told that he would share in the profits of the group after he completed a probationary period.
Dr. Martin recounted that in his initial interview, Dr. Bloom asked about "ownership participation" in the corporations. Dr. Martin responded that Dr. Israel essentially controlled Belleville Associates, but depending on the circumstances, Dr. Bloom might *601 later have the opportunity to purchase an ownership interest in the office corporation. Dr. Martin testified that he told Dr. Bloom he would be given "increasing profit participation" following completion of his second year with the group and that he would be entitled to an equal share after five years. Dr. Martin recounted that he subsequently refused to sell Dr. Bloom any shares in I & S. Although Dr. Bloom expressed his displeasure with that decision, he continued to practice with the group without further objection.
Dr. Martin testified that when Dr. Stavis interviewed for a position in 1982, he never requested a written contract and did not ask about the possibility of purchasing an equity interest in the practice. According to Dr. Martin, Dr. Stavis seemed more concerned about "hav[ing] a collegial atmosphere" and becoming involved in decisions relating to the purchase of equipment and the medical aspects of the practice.
Dr. Heimann joined Belleville Associates in 1987, after Dr. Israel retired. At the time Dr. Heimann was hired, Dr. Martin was still the chairperson of Clara Maass' radiology department. However, in 1988, Clara Maass decided to replace Dr. Martin because of complaints regarding the manner in which the department was performing. Because their staff privileges at Clara Maass depended upon the chairperson of the department, plaintiffs and Dr. Heimann asked to have a representative on the search committee. The hospital acceded to their request, and Dr. Schatzman was made a member of the committee. In August 1988, Clara Maass named Dr. Schatzman chairperson of the department and Dr. Heimann associate chairperson.
Clara Maass' president and chief executive officer, Robert Curtis, and its senior vice-president, Neil Dello Russo, both testified about the process involved in selecting a chairperson for the radiology department. They recounted that the hospital first began receiving complaints about the quality of services performed by the radiology department in 1984. Doctors in other departments complained that the radiologists were not "responsive." *602 These complaints reached their peak in 1987 when the hospital was considering "advancing into out-patient diagnostic radiology." There were specific concerns about Dr. Stovin's competence and the poor quality of Dr. Stavis' diagnostic reports. Dr. Heimann was not considered to be part of the problem. To the contrary, he was held in high regard by members of the hospital's medical staff.
Dr. Dello Russo testified that he engaged in several discussions with Dr. Bloom who expressed concern about the security of staff privileges once a new chairperson was appointed. Dr. Bloom was specifically told that the chairperson would have the authority to terminate the other radiologists if he or she deemed it necessary. According to Dr. Dello Russo, the search committee initially offered the chair to a doctor who ultimately rejected the position. At that point, Dr. Schatzman proposed himself as a candidate. The committee decided to appoint Dr. Schatzman because he was an excellent radiologist, but insisted that Dr. Heimann serve as associate chairperson because of his leadership skills.
Dr. Schatzman was given a written contract to serve as chairperson with the exclusive right to furnish radiological services and to hire and fire other physicians in the department. His tenure proved very brief. Although the record is not altogether clear, it appears that Dr. Schatzman never signed the contract but instead "disappeared" under mysterious circumstances. While it is inferable that Dr. Schatzman's disappearance was the result of nervous stress caused by his decision to fire Dr. Stovin, the facts surrounding the incident are murky. In any event, Dr. Schatzman was removed as chairperson when he returned from his unauthorized leave.
Dr. Heimann was then appointed chairperson. Both administrators testified that the problems that had plagued the radiology department over the years were rectified shortly after Dr. Heimann's appointment. In 1991, however, several members of Belleville Associates complained to Dr. Dello Russo that Dr. Heimann "was running" the department in a "dictatorial manner." Dr. *603 Heimann, under a written contract as chairperson, had exclusive responsibility for providing radiological services to the hospital. The agreement allowed Dr. Heimann to select physicians to assist him, and required "[e]ach ... to agree in writing to abide by the terms" of Dr. Heimann's contract. The contract further stated that these written agreements were to "be provided to [the] Hospital from time to time." The employment agreement to be signed by physicians assisting Dr. Heimann was attached as a rider to Dr. Heimann's contract. Upon becoming chairperson, Dr. Heimann did not have the group members sign the rider. Instead, Dr. Heimann demanded extra compensation to reflect his new administrative responsibilities and told plaintiffs that their job security depended upon the quality of the service they provided. Dr. Heimann never apprised plaintiffs that he had a written contract with Clara Maass.
Plaintiffs' discontent with Dr. Heimann gave added urgency to their efforts to obtain an equity interest in Belleville Associates. When it first appeared that Dr. Martin might lose the chair of Clara Maass' radiology department, plaintiffs requested that they be given shares in Belleville Associates. Dr. Martin rejected their proposal, demanding payment of $125,000 in return for his signing a shareholders' agreement. After retaining an attorney, plaintiffs offered $70,000, but again Dr. Martin rejected that proposal.
Although Dr. Martin was not amenable to giving plaintiffs an equity interest in Belleville Associates, he initially sided with them in their dispute with Dr. Heimann. In the winter of 1991, all of the radiologists except Dr. Heimann met at Dr. Bloom's house. At Dr. Martin's urging, the men gathered in a circle, joined hands, and expressed their "unity of purpose" in deposing Dr. Heimann as chairperson. Subsequently, a document was signed by the physicians memorializing their desire to "reorganiz[e]" Belleville Associates, "if possible, and if not, to establish a new entity in which each [would] hold equal voting rights." The document declared that the physicians were "united in [their] efforts to enter into agreement with Clara Maass Hospital to fully and exclusively *604 staff the [r]adiology [d]epartment" and to assure that Dr. Robert Traflet, who had joined Belleville Associates in 1989, would be appointed chairperson. Dr. Bloom and Dr. Schatzman testified that Dr. Martin conceived the plan of urging Clara Maass to replace Dr. Heimann with Dr. Traflet.
Shortly after signing this document, Dr. Martin and Dr. Traflet met with the hospital's medical board and requested that Clara Maass contract with the group to furnish radiological services. However, in March 1991, the hospital's ad hoc committee recommended that Dr. Heimann retain his chair of the radiology department and that he again be given an exclusive contract to supply radiology responsibilities. The committee also recommended that Dr. Heimann provide each member of Belleville Associates with a "just and equitable contract." According to plaintiffs, upon learning of the committee's decision, Dr. Martin "backed down" from his agreement to seek a reorganization of the radiology department and again rejected the group's demand to distribute shares of Belleville Associates.
In the same month, Dr. Heimann signed a new contract with Clara Maass, retroactive to July 1, 1990. The agreement included a provision for payment of $25,000 to Dr. Heimann in recognition of his administrative duties as chairperson.
On May 24, 1991, plaintiffs sent a letter to Dr. Martin informing him that they, "as shareholders," were calling a meeting on June 3, 1991, at which time they would elect a board of directors. Neither Dr. Martin nor Dr. Heimann attended the meeting. On the day of the meeting, plaintiffs sent a letter to Dr. Heimann purporting to terminate his employment with Belleville Associates. On the following day, plaintiffs sent a letter to the "medical community of Clara Maass" informing the hospital staff that they would be operating the radiology department "independent" of Dr. Heimann. The hospital replied that it recognized Dr. Heimann as chairperson of the department and that plaintiffs' staff privileges would be terminated unless they signed employment contracts with Dr. Heimann. Dr. Heimann then sent proposed employment *605 contracts to plaintiffs. Dr. Dello Russo had previously reviewed drafts of the employment contracts and had made several recommendations that were incorporated in the proposals sent to plaintiffs. Dr. Dello Russo testified that he believed that the contracts finally offered to plaintiffs were fair and equitable. Plaintiffs nevertheless rejected these proposals and commenced this litigation.
Against this factual backdrop, Judge Simon determined that Clara Maass' closed-staff policy had a rational nexus to a legitimate public health purpose. The judge emphasized that the hospital withdrew the plaintiffs' staff privileges for reasons other than their medical skill or competency. The judge thus concluded that the dispute concerned the impact of Dr. Heimann's exclusive contract to furnish radiological services, not plaintiffs' acumen as physicians. The court concluded that the hospital's procedural safeguards pertaining to the revocation of staff privileges on the basis of lack of skill or physician incompetence were not applicable. Nor did the hospital's withdrawal of staff privileges bear upon plaintiffs' professional reputations, which perhaps might implicate due process concerns.
The judge further concluded that plaintiffs did not have an equity interest in Belleville Associates. He found instead that they were mere employees who were to be considered partners only to the extent that they shared equally in compensation after successfully completing their probationary conditions. The judge found by "clear and convincing evidence" that Dr. Martin was the sole shareholder of Belleville Associates. The judge additionally determined that neither Dr. Heimann nor Dr. Martin breached an express or implied agreement with plaintiffs. The judge found that Dr. Heimann should have distributed portions of his $25,000 stipend to members of the hospital corporation in accordance with their agreement to share profits equally. He thus ordered Dr. Heimann to share the stipend with plaintiffs. However, the judge determined that plaintiffs were not entitled to any further relief.
*606 The judge found no basis for Dr. Heimann's counterclaim. He concluded that plaintiffs had the right to attempt to depose Dr. Heimann from the chair of Clara Maass' radiological department, and their conduct in that respect did not constitute tortious interference with prospective economic advantage. The judge added that Dr. Heimann suffered no loss or damage arising from plaintiffs' conduct. Judgement was entered accordingly.

II.
We first conclude that the Chancery Division correctly granted Clara Maass' motion for summary judgment.[2] Specifically, we hold that Clara Maass' decision to enter an exclusive contract with Dr. Heimann for the provision of radiological services and to require plaintiffs to sign employment agreements with him or lose their staff privileges neither violated the hospital's bylaws nor infringed upon any protected right.
At the outset, we quickly reject Dr. Stavis' argument that he was entitled to the procedural safeguards afforded by the hospital's bylaws. The bylaws provide for a hearing and an appeal for physicians who are removed for reasons "relating to competency in performing professional, clinical tasks." Here, withdrawal of *607 plaintiffs' staff privileges was not in any way predicated upon charges of incompetence or malpractice. Although the record contains oblique and cryptic references to the medical staff's displeasure with Dr. Stavis' diagnostic reports, he was not removed for reasons relating to the manner in which he performed his medical duties. Clearly, the hearing and appeal procedures mandated by the bylaws were not triggered in this case.
We thus come then to the question of whether Clara Maass' closed-staff policy, or the manner in which it was applied, contravenes public policy. In a series of decisions beginning in 1961, our Supreme Court has focused upon the triadic relationship between private hospitals, doctors and patients. Nanavati v. Burdette Tomlin Memorial Hosp., 107 N.J. 240, 526 A.2d 697 (1987); Desai v. St. Barnabas Medical Ctr., 103 N.J. 79, 510 A.2d 662 (1986); Berman v. Valley Hosp., 103 N.J. 100, 510 A.2d 673 (1986); Belmar v. Cipolla, 96 N.J. 199, 475 A.2d 533 (1984); Doe v. Bridgeton Hosp. Ass'n, 71 N.J. 478, 366 A.2d 641 (1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977); Greisman v. Newcomb Hosp., 40 N.J. 389, 192 A.2d 817 (1963); Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791 (1961); Petrocco v. Dover Gen. Hosp., 273 N.J. Super. 501, 642 A.2d 1016 (App.Div.), certif. denied, 138 N.J. 264, 649 A.2d 1284 (1994). We distill the following legal principles from these decisions.
Hospitals exist to provide health care to the public, but in serving the needs of their patients they provide a place of employment to doctors and other professionals. The privilege to admit and treat patients is often critical to a doctor's ability to practice his profession. Both doctors and their patients may suffer if otherwise qualified physicians are wrongly denied staff privileges. A hospital's selection of medical staff is thus deeply embedded in public policy concerns and must be "exercised reasonably and for the public good." Desai v. St. Barnabas Medical Ctr., 103 N.J. at 87, 510 A.2d 662 (quoting Greisman v. Newcomb Hosp., 40 N.J. at 402, 192 A.2d 817).
*608 Many years ago, our Supreme Court rejected the thesis that decisions of private hospitals concerning staff privileges were beyond judicial review. The scope of judicial review depends on the nature of the issue presented. "[C]ourts should sustain a hospital's standard for granting staff privileges if that standard is rationally related to the delivery of health care." Nanavati v. Burdette Tomlin Memorial Hosp., 107 N.J. at 249, 526 A.2d 697. Although not quite so deferential when reviewing decisions denying staff privileges, "[t]he test for judicial review of such a decision is whether it is supported by `sufficient reliable evidence....'" Ibid. (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 565, 401 A.2d 533 (1979)). "[A] decision denying or revoking staff privileges merits a closer look than a decision setting the standard for the determination of those privileges." Id. at 250, 526 A.2d 697. However phrased, "courts should allow hospitals, as long as they proceed fairly, to run their own business." Id. at 249-50, 526 A.2d 697.
It has been said that a hospital must follow fair procedures when considering staff privileges, and may not arbitrarily foreclose otherwise qualified doctors from utilizing its facility. Id. at 247, 526 A.2d 697. "Hospital powers that relate to the quality and extent of hospital health-care facilities and services must be exercised reasonably for the public good and must genuinely serve public-health objectives, which include the needs of the patients, particularly the reasonable opportunity to select physicians...." and to have adequate access to appropriate treatment. Desai v. St. Barnabas Medical Ctr., 103 N.J. at 90-91, 510 A.2d 662. Mindful of the intrinsic complexities that abound in the area of institutional public health care, the courts are obliged to sustain a hospital's policy decision affecting staff privileges even if it may have a discriminatory impact if it "reasonably serves an evident public-health purpose." Id. at 91, 510 A.2d 662.
Applying that test, our Supreme Court upheld a hospital's closed staff policy almost identical to that at issue here in Belmar v. Cipolla, 96 N.J. 199, 475 A.2d 533. There, several doctors *609 instituted an action challenging Community Hospital Group's decision to enter into an exclusive contract with an anesthesiologist for provision of all anesthesiological services at the hospital. Id. at 201, 475 A.2d 533. They contended that the hospital's policy discriminated against other qualified anesthesiologists. Id. at 206, 475 A.2d 533. At trial, expert witnesses differed about the relative advantages and disadvantages of the exclusive contract. Id. at 210, 475 A.2d 533. In sustaining the hospital's policy, the Court pointed to evidence that indicated "the decision to enter an exclusive contract for the provision of anesthesia services was motivated by the ... desire to insure a high standard of medical care." Id. at 211, 475 A.2d 533. The Court concluded that "[u]nder the circumstances, the decision to enter an exclusive contract was a reasonable choice, and the contract [did] not violate public policy." Ibid. See also Desai v. St. Barnabas Medical Ctr., 103 N.J. at 93, 510 A.2d 662; Berman v. Valley Hosp., 103 N.J. at 106, 510 A.2d 673.
In a similar vein, we hold that Clara Maass' decision to award an exclusive contract for the provision of radiological services, which led to the revocation of plaintiffs' staff privileges, constituted a reasonable management decision. The record indicates that the hospital's policy was designed to insure central control over the department's services, simplified scheduling of diagnostic procedures, better coordination with other physicians, enhanced availability during working and nonworking hours, and effective billing and collection. These are appropriate health care objectives, and the means used to attain them were manifestly reasonable.
The record is barren of any evidence suggesting that the closed staff policy was merely a pretext for the purpose of terminating Dr. Stavis' staff privileges. Clara Maass was willing to allow plaintiffs to continue to practice at the hospital as long as they signed written contracts and worked under Dr. Heimann as chairperson. Plaintiffs refused to sign employment contracts with Dr. Heimann due to their personal dislike for him and his style of management. Perhaps their feelings were justified. But, we as *610 judges hold no roving commission on this account to intervene in the hospital's internal affairs and abrogate a policy that has been in existence at Clara Maass since at least 1966.

III.
We also find no sound basis to disturb the judge's findings that plaintiffs were not shareholders or partners in Belleville Associates, and that neither Dr. Martin nor Dr. Heimann breached a fiduciary duty owed to them or an implied covenant of good faith and fair dealing. These were fact-sensitive issues and their resolution hinged upon the judge's determination of the credibility of the witnesses. We are obliged to give deference to the findings of the judge which were substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which we as appellate judges cannot enjoy. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). Our examination of the voluminous record discloses that "the findings made could reasonably have been reached on sufficient credible evidence present in the record." Id. at 162, 199 A.2d 809; see also Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Ample evidence was presented that Dr. Stavis did not own an equity interest in Belleville Associates. The Uniform Partnership Law (N.J.S.A. 42:1-1 to -43) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.J.S.A. 42:1-6. A partnership is created "when persons join together their money, goods, labor or skill for the purpose or carrying on a trade, profession, or business, and where there is a community of interest in the profits or losses." Farris v. Farris Eng'g Corp., 7 N.J. 487, 498-99, 81 A.2d 731 (1951). Under the partnership statute, receipt of a share of the profits of a business is prima facie evidence that one is a partner in the business, but that inference is not to be drawn if the profits were received "[a]s wages of an employee." N.J.S.A. 42:1-7(4)(b). The statute further provides that "[t]he sharing of gross returns does not of itself establish a partnership...." N.J.S.A. 42:1-7(3). *611 Thus, "not every agreement that gives the right to share profits is for all purposes a partnership agreement." Farris v. Farris Eng'g Corp., 7 N.J. at 502-03, 81 A.2d 731; see also Fenwick v. U.C.C. of N.J., 133 N.J.L. 295, 298, 44 A.2d 172 (E. & A. 1945).
The record contains substantial evidence that the plaintiffs' right to share in the profits of Belleville Associates was not meant to divest Dr. Martin of his ownership rights of the corporation. Belleville Associates was established as a corporation, filed its income tax returns as a corporation, and had a pension plan as a corporation. Plaintiffs' repeated attempts to obtain shares of stock in the corporation were rejected by Dr. Martin. Moreover, Dr. Martin contributed capital to the corporation and at all times reserved to himself full control over its affairs. See Fenwick v. U.C.C. of N.J., 133 N.J.L. at 298, 44 A.2d 172. Although many of the decisions pertaining to the medical practice were arrived at by consensus, management of the corporation's business affairs was within the exclusive control of Dr. Martin. He dealt with the accountants, filed the tax returns, made unilateral decisions concerning the purchase of equipment, and decided the amount of profits subject to distribution. There was no partnership agreement, and one cannot be implied from the conduct of the parties. See, e.g., Kozlowski v. Kozlowski, 164 N.J. Super. 162, 171, 395 A.2d 913 (Ch.Div. 1978), aff'd, 80 N.J. 378, 403 A.2d 902 (1979).
We agree with Judge Simon that neither Dr. Heimann nor Dr. Martin breached a fiduciary duty owed to the plaintiffs. Plaintiffs were neither partners nor shareholders, and we find no basis in the record to conclude that either Dr. Heimann or Dr. Martin stood in a fiduciary relationship with them. See Silverstein v. Last, 156 N.J. Super. 145, 151, 383 A.2d 718 (App.Div. 1978) (prohibiting partners from making "inordinate" and "undisclosed" profit); Heller v. Hartz Mountain Indus., 270 N.J. Super. 143, 151, 636 A.2d 599 (Law Div. 1993) (defining partner's duty as "utmost good faith, permitting ... no secret advantages or benefits"); see also Valle v. North Jersey Auto. Club, 141 N.J. Super. 568, 573-74, 359 A.2d 504 (App.Div. 1976) (stating director may not usurp a *612 corporate opportunity), aff'd, 74 N.J. 109, 376 A.2d 1192 (1977). Although Dr. Stavis characterizes Dr. Heimann and Dr. Martin as conspirators who made secret deals with Clara Maass, the record does not support that description. Judge Simon found that the plaintiffs knew or should have known about the existence of the exclusive contract with Clara Maass, and the evidence overwhelmingly supports that conclusion. Dr. Martin's ultimate decision to "give up the fight against" Dr. Heimann was not the determining factor in the loss of plaintiffs' staff privileges. The turning point was the ad hoc committee's recommendation to retain Dr. Heimann as chairperson of the hospital's radiology department and plaintiffs' refusal to sign employment contracts with him.
We are also in complete accord with Judge Simon's determination that neither Dr. Heimann nor Dr. Martin breached an implied covenant of good faith and fair dealing. See Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981); Sons of Thunder, Inc. v. Borden, Inc., 285 N.J. Super. 27, 49, 666 A.2d 549 (App.Div. 1995).
We add for the sake of completeness that plaintiffs were not otherwise entitled to share in the accounts receivable of Belleville Associates following their resignation. Judge Simon found that profits were always distributed based on "cash on hand." As employees rather than owners, plaintiffs were not entitled to share in accounts receivable when they terminated their employment.

IV.
We find no merit in Dr. Heimann's cross-appeal. R. 2:11-3(e)(1)(E). Plaintiffs did not engage in "sharp dealing" or overreaching when they attempted to persuade Clara Maass to appoint Dr. Traflet, rather than Dr. Heimann, as chairperson of the radiology department. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 758, 563 A.2d 31 (1989) (quoting Harris v. Perl, 41 N.J. 455, 461, 197 A.2d 359 (1964)). In any event, they were unsuccessful in their attempt. Dr. Heimann thus suffered no *613 loss or injury. Id. at 751-52, 563 A.2d 31. The judge properly rejected Dr. Heimann's claim that plaintiffs had tortiously interfered with his prospective economic advantage.
Finally, we find no error in the judge's order requiring Dr. Heimann to share his $25,000 stipend from Clara Maass. Plaintiffs were entitled to an equal share of cash on hand generated by the practice.
Affirmed.
NOTES
[1] The one chairperson without a written contract had a verbal agreement with Clara Maass.
[2] The summary judgment order was certified as final under R. 4:42-2 in order to give plaintiffs an opportunity to appeal. R. 4:42-2 was intended to permit execution of a fully adjudicated partial judgment for affirmative relief. Pressler, Current N.J. Court Rules, comment on R. 4:42-2 (1997). As Judge Pressler notes in her comment on the rule, trial courts often "misuse" the rule by certifying as final "a partial adjudication other than one granting affirmative relief in order that the adjudication be immediately appealable." Ibid. "[T]he certification technique is not available for the sole purpose of achieving interlocutory review." Ibid. We are satisfied that R. 4:42-2 was applied improperly in this case. The order in favor of Clara Maass was a partial summary judgment, which is an interlocutory adjudication. Applestein v. United Bd. & Carton Corp., 35 N.J. 343, 351, 173 A.2d 225 (1961). The order became appealable upon entry of the final judgment. Daly v. High Bridge Teachers' Ass'n, 242 N.J. Super. 12, 575 A.2d 1373 (App.Div.), certif. denied, 122 N.J. 356, 585 A.2d 366 (1990). Dr. Stavis filed his notice of appeal within forty-five days of the final judgment. His appeal is thus timely.