686 A.2d 1239

NORMAN ENDE, M.D., PLAINTIFF–RESPONDENT, v. STANLEY COHEN, M.D., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CHAIR, DEPARTMENT OF PATHOLOGY, UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY; SEENA AISNER, M.D., INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS CHIEF OF SERVICE AND DIRECTOR OF ANATOMIC PATHOLOGY, DEPARTMENT OF PATHOLOGY, UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY; FRANK B. FROMOWITZ, M.D., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS PROFESSOR AND DIRECTOR OF SURGICAL PATHOLOGY, DEPARTMENT OF PATHOLOGY, UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY; THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY; THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY—UNIVERSITY HOSPITAL; THE MEDICAL STAFF OF UNIVERSITY HOSPITAL, UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY; THE TRUSTEES OF THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, WHO VOTED ON JULY 23, 1996 TO CONFIRM THE NON-REAPPOINTMENT RECOMMENDATION MADE BY THE MEDICAL EXECUTIVE COMMITTEE AND WHOSE PARTICULAR IDENTITIES ARE AT THIS TIME UN-

KNOWN TO THE PLAINTIFF; UNIVERSITY PHYSICIAN AS-
SOCIATES OF NEW JERSEY, INC., DEFENDANTS–APPEL-
LANTS, AND "JOHN & JANE DOES 1–20", WHOSE REAL
IDENTITIES ARE AT THIS TIME UNKNOWN TO THE PLAIN-
TIFF; "ABC CO.S 1–20", FICTITIOUS ENTITIES, DEFEN-
DANTS.

Superior Court of New Jersey
Appellate Division

Argued December 18, 1996—Decided January 14, 1997.

Before Judges BAIME, PAUL G. LEVY and BRAITHWAITE.

*Katherine L. Suga,* Senior Deputy Attorney General, argued the cause for appellant University of Medicine and Dentistry of New Jersey (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Suga,* on the brief).

*Robert J. Conroy* argued the cause for respondent (*Kern, Augustine, Conroy & Schoppmann,* attorneys; *Mr. Conroy,* of counsel and on the brief; *Michael O. Dermody,* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

The Chancery Division disqualified University Hospital's (Hospital) Medical Executive Committee (MEC) from serving as the hearing tribunal respecting plaintiff's application for renewal of staff privileges. The court also barred the Board of Trustees (Board) of the University of Medicine and Dentistry of New Jersey (University) from reviewing the MEC's decision in the event of an appeal. The court found that both the MEC and the Board prejudged plaintiff's application by virtue of their limited

review of material presented by the pathology department's chairperson in support of his recommendation against renewal of privileges and their preliminary decisions accepting that recommendation. Based upon that finding, the court designated a private corporation, the Union County Medical Society, to decide whether plaintiff is entitled to continue serving on the staff of University Hospital.

Leave having been granted, defendants appeal. We reverse. We hold that the mere fact the MEC and the Board investigated the matter in question and made preliminary decisions not to renew plaintiff's staff privileges did not render those bodies incompetent to adjudicate the issue in the context of an adversarial plenary hearing.

## I.

Plaintiff is a tenured professor of the University and has been a member of the teaching staff of its pathology department since 1970. Prior to July 1, 1996, he also held staff privileges at the Hospital. Defendant Stanley Cohen was appointed chair of the pathology department in 1994. Defendants Seena Aisner and Frank Fromowitz joined the department in 1995 as directors of anatomic pathology and surgical pathology. Following their arrival, both Drs. Aisner and Fromowitz expressed concern regarding plaintiff's ability to perform his surgical pathology responsibilities. They claimed, for example, that plaintiff grossly misdiagnosed an ovarian tumor, failed to recognize prostate cancer in a needle biopsy, and did not provide the most rudimentary data respecting a carcinoma.

Based upon these concerns, plaintiff was relieved of his surgical pathology duties and was appointed interim director of autopsy services. This is essentially a teaching position, and participating faculty members are rarely involved in the actual dissections performed by residents as part of their training. Plaintiff nevertheless refused to accept the assignment, claiming that he suffered from muscle spasms in his hands that prevented him from per-

forming dissections. Accepting plaintiff's claimed incapacity, Dr. Cohen arranged for other faculty members to perform dissections in the unusual event a resident needed assistance.

As these events were unfolding, plaintiff applied for renewal of his staff privileges which were to expire on June 30, 1996. Among other things, this process required the department chairperson to certify that the applicant was "physically and mentally capable of practicing medicine and performing [his] assigned duties." Plaintiff was thus asked to undergo a physical examination by an independent physician. However, plaintiff refused to be examined without the presence of his attorney. His examination was canceled.

Tension continued to simmer. The University Physician Associates, the faculty practice plan that manages all billings for the University's clinical faculty, informed plaintiff that his laboratory billing collection activities were to be consolidated within its control although he had been granted an exemption in 1992. While the exemption had expired and plaintiff had made no effort to renew it, he viewed the decision as a form of harassment.

On June 11, 1996, Dr. Cohen notified the Hospital's credentials committee that he did not recommend renewal of plaintiff's staff privileges. In support of his decision, Dr. Cohen submitted Dr. Fromowitz's analysis of several diagnostic errors made by plaintiff. Other documentary submissions cited plaintiff's refusal to accept teaching assignments, insubordinate and disruptive conduct during the recruitment of potential faculty, and noncompliance with the billing and contribution requirements of the University Physician Associates.

In accordance with the Hospital's by-laws, these materials were presented to the MEC, which met in executive session. Fourteen members of the MEC were present, including Dr. Cohen. The MEC voted, twelve to zero with two abstentions, not to renew plaintiff's staff privileges. Plaintiff was notified of the MEC's adverse determination and was advised of his right to a hearing. On July 16, 1996, the MEC's recommendation was reported to the

Hospital's Joint Conference/Planning Committee and was then forwarded to the Board of Trustees, the statutory governing body of the University. *See N.J.S.A.* 18A:64G–4. On July 23, 1996, the Board upheld the recommendation of the MEC. By this time, plaintiff's staff privileges, which were valid for a two-year term, had expired. However, the Hospital's by-laws, which we will describe in greater detail later in our opinion, provided for a full adversarial hearing by a committee of the MEC and, in the event of an adverse ruling, an appeal to the Board of Trustees. Plaintiff requested a hearing and was granted full discovery of the materials upon which the MEC and the Board had relied in making their initial decisions. However, before a hearing could be conducted, plaintiff commenced this action in the Chancery Division.

On August 9, 1996, plaintiff filed an order to show cause supported by a multi-count complaint, alleging breach of contract, age and handicap discrimination, and various due process violations. In the complaint, plaintiff sought injunctive relief and monetary damages. On August 15, 1996, the Chancery Division conducted a hearing on plaintiff's application for temporary restraints. While denying emergent renewal of plaintiff's staff privileges, the court disqualified the MEC and the Board from taking any further action in the case. Under the Chancery Division's order, the Union County Medical Society is to determine whether plaintiff's staff privileges are to be renewed. Defendants appealed following the denial of their motion for reconsideration. We accelerated the appeal and now reverse.

## II.

We stress that the Chancery Division's decision was based solely upon plaintiff's challenge to the validity of the Hospital's by-laws. More specifically, the court found that the by-laws impinged upon due process concerns because the MEC and the Board make initial decisions with respect to an applicant's credentials and fitness and then become the final arbiters of the very issues they investigated. It was this combination of investigative,

charging, and adjudicative functions in the same administrative tribunals that the court found to be constitutionally offensive. We thus describe the by-laws in detail.

The University by-laws govern all procedures regarding physician staff appointment, reappointment, termination, and hearings. Initial appointments are for one year, and reappointments are for two-year periods. Staff members must apply for reappointment every two years. The chief of service reviews the staff member's application and reports to the credentials committee his or her recommendation that the appointment either be renewed or terminated. If the decision is adverse, the chief of staff also submits for review the reasons behind that decision. The credentials committee then reviews the application and recommendation and makes its own decision, and in turn submits its recommendation and report to the MEC. The MEC follows the same course of action, submitting its recommendation and report to the Board. The applicant's right to a plenary hearing is triggered by an adverse ruling by the Board. The hearing committee consists of six at-large members of the MEC, none of whom are a dean, chairperson, chief of service or "are in direct economic competition with the physician involved." Furthermore, "[a]ny individual who has participated in initiating or investigating [the] underlying matters at issue [is] disqualified from serving on a [h]earing [c]ommittee." [1] The by-laws also give the applicant the right to an attorney, to present evidence, and to cross-examine witnesses. The hearing committee's findings and recommendation are submitted to the MEC, which either affirms, modifies, or reverses the decision. The staff member is then notified of the MEC's decision and of his or her right to appellate review by the Board. The Board makes the final decision.

---

[1] Application of this by-law to the facts of this case is unclear. In their motion for reconsideration, defendants suggested that the plenary hearing before the MEC would be conducted only by those members who did not participate in prior internal proceedings relating to plaintiff's application. That representation has not been repeated in defendants' brief or in their oral argument.

## III.

The novel question presented is whether a hospital may combine investigative, charging and adjudicative functions in the same administrative body when determining whether a physician's staff privileges are to be renewed. Although the precise question is of first impression, we do not write on a blank slate. Only recently, in *Bloom v. Clara Maass Medical Center*, 295 *N.J.Super.* 594, 685 *A.2d* 966 (App.Div.1996), we focused upon the triadic relationship between hospitals, doctors and patients. While we revisit the area here in a somewhat different setting, many of the principles we cited in that opinion are equally applicable.

Hospitals exist to furnish health care to the public, but in serving the needs of their patients they provide a place of employment to doctors and other professionals. The privilege to admit and treat patients is often critical to a doctor's ability to practice his profession. Both doctors and their patients may suffer if otherwise qualified physicians are wrongly denied staff privileges. A hospital's selection of medical staff is thus deeply embedded in public policy concerns and must be "exercised reasonably and for the public good." *Desai v. St. Barnabas Medical Ctr.*, 103 *N.J.* 79, 87, 510 *A.2d* 662 (1986) (quoting *Greisman v. Newcomb Hosp.*, 40 *N.J.* 389, 402, 192 *A.2d* 817 (1963)).

Thirty-five years ago, our Supreme Court rejected the notion that decisions of hospitals concerning staff privileges were beyond judicial review. *Greisman v. Newcomb Hosp.*, 40 *N.J.* at 395–96, 192 *A.2d* 817. In a lengthy series of decisions, our courts have closely scrutinized hospital practices on this subject, and have not been reluctant to intervene where necessary to protect the public interest. *See, e.g., Nanavati v. Burdette Tomlin Memorial Hosp.*, 107 *N.J.* 240, 248, 526 *A.2d* 697 (1987); *Desai v. St. Barnabas Medical Ctr.*, 103 *N.J.* at 90–91, 510 *A.2d* 662; *Berman v. Valley Hosp.*, 103 *N.J.* 100, 106–07, 510 *A.2d* 673 (1986); *Belmar v. Cipolla*, 96 *N.J.* 199, 208, 475 *A.2d* 533 (1984); *Garrow v. Elizabeth Gen. Hosp. & Dispensary*, 79 *N.J.* 549, 557–58, 401 *A.2d* 533 (1979); *Doe v. Bridgeton Hosp. Ass'n*, 71 *N.J.* 478, 487, 366 *A.2d*

641 (1976), *cert. denied,* 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977); *Greisman v. Newcomb Hosp.,* 40 *N.J.* at 402–04, 192 *A.*2d 817; *Falcone v. Middlesex County Medical Soc'y,* 34 *N.J.* 582, 590, 170 *A.*2d 791 (1961); *Petrocco v. Dover Gen. Hosp.,* 273 *N.J.Super.* 501, 514–18, 642 *A.*2d 1016 (App.Div.), *certif. denied,* 138 *N.J.* 264, 649 *A.*2d 1284 (1994); *Grodjesk v. Jersey City Medical Ctr.,* 135 *N.J.Super.* 393, 413–14, 343 *A.*2d 489 (Ch.Div. 1975).

The scope of judicial review depends on the nature of the issue presented. The various permutations are discussed at length in *Nanavati v. Burdette Tomlin Memorial Hosp.,* 107 *N.J.* at 249, 526 *A.*2d 697, and *Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 *N.J.* at 565, 401 *A.*2d 533. While the test for judicial review of a hospital's decision denying staff privileges is whether the determination "is supported by 'sufficient reliable evidence,'" *Nanavati v. Burdette Tomlin Memorial Hospital,* 107 *N.J.* at 249, 526 *A.*2d 697 (quoting *Garrow v. Elizabeth General Hospital & Dispensary,* 79 *N.J.* at 565, 401 *A.*2d 533), our focus here is on the constitutionality and fairness of the procedures employed by University Hospital. We thus find that standard unhelpful in the context of the issue presented. Instead, we look to the general principle that a hospital must follow fair procedures when considering staff privileges, and may not arbitrarily foreclose otherwise qualified doctors from utilizing its facilities. *See, e.g., Nanavati v. Burdette Tomlin Memorial Hosp.,* 107 *N.J.* at 247, 526 *A.*2d 697; *Bloom v. Clara Maass Medical Ctr.,* 295 *N.J.Super.* at 608, 685 *A.*2d 966. Mindful of the intrinsic complexities that abound in the area of institutional public health care, we are obliged to sustain the Hospital's procedure if it reasonably serves an evident public health purpose. *See Desai v. St. Barnabas Medical Ctr.,* 103 *N.J.* at 90–91, 510 *A.*2d 662. In making this determination, we must recognize that we have no monopoly on justice and that the "courts should allow hospitals, as long as they proceed fairly, to run their own business" as they deem fit.

*Nanavati v. Burdette Tomlin Memorial Hosp.*, 107 *N.J.* at 249–50, 526 *A.*2d 697.

■ Against this backdrop, we note that the United States Supreme Court has repeatedly rejected arguments that an administrative body's receipt of investigative results and its approval of the filing of formal charges precludes its participation in subsequent proceedings. In *Withrow v. Larkin*, 421 *U.S.* 35, 95 *S.Ct.* 1456, 43 *L.Ed.*2d 712 (1975), the Wisconsin Examining Board commenced an investigation against defendant, a licensed physician. He was invited to attend the Board's investigative hearing, along with counsel, but was not permitted to cross-examine any witnesses. *Id.* at 39, 95 *S.Ct.* at 1456, 43 *L.Ed.*2d at 719. As a result of the hearing, the Board would decide whether to take disciplinary action, institute a criminal action or revoke Withrow's license. *Ibid.* Subsequently, the Board notified Withrow that a "contested hearing" would be held to determine whether his license was to be temporarily suspended. *Id.* at 40–41, 95 *S.Ct.* at 1461, 43 *L.Ed.*2d at 719–20. The District Court issued an injunction. *Id.* at 41, 95 *S.Ct.* at 1461, 43 *L.Ed.*2d at 720.

The Supreme Court reversed, rejecting the notion that "the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication." *Id.* at 47, 95 *S.Ct.* at 1464, 43 *L.Ed.*2d at 723. In reaching this conclusion, the Court reasoned, "just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute." *Id.* at 57, 95 *S.Ct.* at 1469, 43 *L.Ed.*2d at 729.

A similar result was reached in *Federal Trade Commission v. Cement Institute*, 333 *U.S.* 683, 68 *S.Ct.* 793, 92 *L.Ed.* 1010 (1948). There, the Commission had instituted proceedings challenging the defendant's pricing practices. The defendant demanded that the Commission members disqualify themselves because they had

participated in the underlying investigation which resulted in the filing of the administrative complaint. *Id.* at 700, 68 *S.Ct.* at 803, 92 *L.Ed.* at 1034. The Supreme Court rejected the defendant's claim that the Commission had prejudged the issues by reason of its prior investigation and filing of a formal charge. *Ibid.* In specific response to the defendant's due process argument, the Court said:

> [No] decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court.

*Id.* at 702–03, 68 *S.Ct.* at 804, 92 *L.Ed.* at 1035; *see also Richardson v. Perales,* 402 *U.S.* 389, 410, 91 *S.Ct.* 1420, 1432, 28 *L.Ed.*2d 842, 857–58 (1971); *NLRB v. Donnelly Garment Co.,* 330 *U.S.* 219, 225–27, 67 *S.Ct.* 756, 760–61, 91 *L.Ed.* 854, 861–62 (1947); *Burnley v. Thompson,* 524 *F.*2d 1233, 1241–42 (5th Cir.1975); *Fuentes v. Roher,* 519 *F.*2d 379, 388–89 (2d Cir.1975); *Rite Aid Corp. v. Board of Pharmacy,* 421 *F.Supp.* 1161, 1176–77 (D.N.J.1976); *Stebbins v. Weaver,* 396 *F.Supp.* 104, 113–14 (W.D.Wis.1975), *aff'd,* 537 *F.*2d 939 (7th Cir.1976), *cert. denied,* 429 *U.S.* 1041, 97 *S.Ct.* 741, 50 *L.Ed.*2d 753 (1977).

Our Supreme Court applied these principles in *In re Carberry,* 114 *N.J.* 574, 556 *A.*2d 314 (1989). There, the Court held that imposition of a suspension by the Superintendent of State Police on a trooper did not preclude the Superintendent from conducting the subsequent disciplinary hearing. *Id.* at 577, 556 *A.*2d 314. In reaching this conclusion, the Court observed that "[a]n agency head ... does not automatically become partial or unfair merely because that person has become familiar with the facts of the case through the performance of statutory or administrative duties." *Id.* at 585, 556 *A.*2d 314. The Court added, "[n]or is disqualification automatically required merely because a decisionmaker has announced an opinion on a disputed issue." *Ibid.* "If an interested party has a right to cross-examine witnesses and present proof,

the mere fact that an administrative agency has conducted an investigation and formulated a policy position does not necessarily mean that the mind of the agency head is closed." *Id.* at 586, 556 *A.*2d 314.

We find these principles controlling. The combination of investigative, charging, and adjudicative functions in the same administrative tribunal does not, without more, constitute a violation of due process. No specific foundation has been presented for suspecting that either the MEC or the Board has been prejudiced by its investigation of plaintiff's fitness or is otherwise disabled from hearing and deciding the relevant issues on the basis of evidence to be presented at a contested hearing. The mere exposure to evidence presented in nonadversary investigative proceedings is insufficient in itself to impugn the fairness of these tribunals at later adversary hearings. We do not perceive the risk of bias or prejudgment in this sequence of functions to be intolerably high so as to warrant judicial intervention. In reaching this result, we do not suggest that there is nothing to the argument that those who have investigated should not then adjudicate. But we view as relatively remote the possibility that the adjudicators will be so psychologically wedded to their complaints that they will be unable to fairly decide the issues on the evidence. Without a showing to the contrary, members of the MEC and the Board "are assumed to be [persons] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan*, 313 *U.S.* 409, 421, 61 *S.Ct.* 999, 1004, 85 *L.Ed.* 1429, 1435 (1941). We perceive no need for judicial interference with the Hospital's administrative processes. *Abbott v. Burke*, 100 *N.J.* 269, 297, 495 *A.*2d 376 (1985); *Garrow v. Elizabeth Gen. Hosp. & Dispensary*, 79 *N.J.* at 559, 401 *A.*2d 533; *In re Stoeco Dev.*, 262 *N.J.Super.* 326, 335, 621 *A.*2d 29 (App.Div.1993).

The order of the Chancery Division is accordingly reversed.