MAHESH R. DESAI, M.D., PLAINTIFF-APPELLANT, v. ST. BARNABAS MEDICAL CENTER, DEFENDANT-RESPONDENT.

Argued September 10, 1985—Decided June 30, 1986.

*Burton L. Eichler* argued the cause for appellant (*Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone,* attorneys; *Burton L. Eichler* and *Joseph M. Gorrell,* on the briefs).

*Everett M. Scherer* argued the cause for respondent (*Riker, Danzig, Scherer & Hyland,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

The main issue posed by this appeal is whether the plaintiff, Mahesh Desai, a medical doctor, was unlawfully denied hospital staff privileges by the defendant, St. Barnabas Medical Center in Livingston (St. Barnabas or hospital). Dr. Desai instituted an action against the defendant hospital seeking to compel the hospital to admit him to its regular medical staff. The law suit was filed after St. Barnabas had thrice rejected Dr. Desai's application for staff privileges. Dr. Desai alleged that the exclusionary application of the hospital's closed-staff admissions policy was arbitrary and capricious. The hospital filed an answer denying the allegations of the complaint and contending generally that its closed-staff policy and actions taken under it were proper. In an unreported opinion, the trial court denied Dr. Desai's requested relief. Following Dr. Desai's appeal, the Appellate Division affirmed the judgment of the trial court in a two sentence *per curiam* opinion. We granted certification. 99 *N.J.* 216 (1984).

## I.

Plaintiff is a qualified medical doctor, having been licensed to practice medicine in New Jersey in June of 1978. Further, he is board certified in internal medicine and gastroenterology, which is a specialty covering enterology and the diagnosis and treatment of diseases of the digestive tract. Defendant is a non-profit, non-sectarian hospital, located in Livingston, New Jersey. The hospital has 705 licensed beds, with approximately 675 attending physicians and a house staff of 120. The hospital services an area that includes Essex, Morris, Sussex and Union Counties.

In 1969, in response to perceived bed overcrowding and over-utilization of the hospital's resources, the hospital adopted a so-called "closed-staff" policy governing the admission of medical doctors to its staff. The staff-admissions policy was, according to the hospital, intended to limit, but not completely close, the hospital staff. Under this policy, a doctor applying for admission to the hospital's medical staff would be given favorable consideration only if he was professionally qualified and if he satisfied one or more of six criteria.[1] The trial court concluded that the single most important factor in determining whether a doctor would be admitted to the staff of St. Barnabas was the final criterion, namely, "whether the physician is associating himself with an existing member of the medical staff."

In August 1978 Dr. Desai purchased the medical practice of a retiring physician in Irvington, New Jersey. On July 3, 1978, in anticipation of establishing his practice, Dr. Desai applied simultaneously for hospital privileges at Beth Israel Hospital in

---

[1]These admissions criteria were whether (1) there was need for additional physician coverage in the relevant department; (2) hospital facilities were available; (3) the applicant possessed some special expertise or (4) engaged in a specialty not represented at the hospital; (5) the applicant did not have privileges at any other area hospital and (6) was joining the medical practice of a current member of the hospital medical staff.

Newark and St. Barnabas Medical Center in Livingston. A few weeks later he also applied for hospital privileges at Irvington General Hospital. Dr. Desai was granted privileges at both Beth Israel and Irvington General Hospitals, and later, at East Orange General Hospital and the Hospital Center at Orange.

On October 20, 1978, the Department of Medicine at St. Barnabas voted to deny plaintiff's application and formally notified him of the rejection in a letter dated May 1, 1979. The reasons stated were "insufficient medical and surgical beds" and the absence on the part of Dr. Desai of "specialized skills which cannot presently be supplied by members of the Staff."

Following successive reapplications, Dr. Desai received identical rejection letters, on May 5, 1980, and June 26, 1981. In addition, on November 6, 1981, following a hearing on Dr. Desai's application before the hospital's Joint Conference and Credential Committee, plaintiff was notified, without explanation, that the decision to reject his application had been affirmed. The hospital claimed, however, that the reasons for the denials of Dr. Desai's application were those set forth in its May 1, 1979, letter of rejection.

The trial court, addressing the question of the original need to adopt the closed-staff policy, determined that the closed-staff policy served to inhibit or reduce a more intensive use of hospital beds. Without making a specific finding of fact regarding the bed occupancy and utilization rate, the trial court implied that the hospital was not completely filled at the present time, but only because of its implementation of the closed-staff policy in 1969. It concluded that there was a "good, sound reason" and a "need for the hospital doing what it did [in adopting a closed-staff admissions policy]."

There was also testimony regarding overcrowding and over-utilization of the endoscopy rooms.[2] The endoscopy rooms at the hospital are normally available from 7:30 a.m. to 3:00 p.m., Monday through Friday, although they can potentially be used starting at 7:00 a.m., after 3:00 p.m., or on weekends, for emergencies or prolonged cases. Dr. Siegel, the former chief of the gastroenterology section of the department of medicine, testified that over the past several years the endoscopy rooms at St. Barnabas "have been over used so far as facility is concerned and under supplied so far as space and ability to work comfortably and well." The trial court apparently concluded that although there was physically time and room left to use the endoscopy rooms at the hospital, the work environment would suffer if additional procedures were performed. Based on these findings, the trial court concluded that the hospital's closed-staff admissions policy, including its exceptions, was reasonable and enforceable.

## II.

Since the seminal case of *Falcone v. Middlesex County Medical Soc'y*, 34 *N.J.* 582 (1961), the strong societal concern in matters affecting public health has been recognized as a significant criterion by which to measure the reasonableness of institutional health-care decisions. The Court in *Falcone* considered the interests of a medical doctor seeking staff privileges at a local hospital. Membership in the county medical society was a prerequisite for securing hospital staff privileges. Because of the society's determinative role in relation to the hospital's medical staff, the Court observed that the society "engages in activities vitally affecting the health and welfare of the people," *id.* at 596–97. Accordingly, the Court considered the society as one "with which the public is highly concerned" and its power "as a fiduciary power to be exercised in a reasonable and lawful

---

[2]Endoscopies entail the examination of the interior of the digestive tract, as well as excissions of tissues through the use of special instruments and invasive quasi-surgical techniques.

manner for the advancement of the interests of the medical profession and the public generally." *Ibid.*

Two years later, in *Greisman v. Newcomb Hosp.*, 40 *N.J.* 389 (1963), the Court dealt with a direct challenge to a hospital for denying staff privileges to an osteopathic doctor on the grounds that the doctor had not been graduated from an A.M.A.-approved medical school nor obtained membership in the county medical society. The Court ruled the hospital's actions were unlawful. The decision stressed that powers exercised in the selection of the hospital medical staff "are deeply imbedded in public aspects, and are rightly viewed, for policy reasons entirely comparable to those expressed in *Falcone*, as fiduciary powers to be exercised reasonably and for the public good." *Id.* at 402.

The Court further observed:

> Hospital officials ... must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good. [*Id.* at 403–04.]

In determining that the hospital's actions were not exercised reasonably for the public good, the Court emphasized that the hospital's policy restricted the patient's ability to select the desired doctor-hospital combination. *Id.* at 402.

In *Doe v. Bridgeton Hosp. Ass'n, Inc.*, 71 *N.J.* 478 (1976), *cert.* denied, 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977), three non-sectarian private hospitals, refused on moral grounds to permit doctors to perform elective abortions. The Court invalidated the hospital's policy, noting the significance of *Greisman's* emphasis on patient's rights and "the [general] obligation of a quasi-public entity to serve the public." *Id.* at 486.

More recently, in *Belmar v. Cipolla*, 96 *N.J.* 199 (1984), the Court reviewed the validity of a hospital's exclusive contract arrangement with a group of anesthesiologists. The Court again emphasized that "no matter what arrangement a hospital may have with doctors, its primary purpose remains to serve the public." *Id.* at 208. The Court reiterated that a hospital, in making staff decisions, must consider the needs of the patients. "[A] hospital has a right and a duty not only to review the qualifications of doctors, but also to consider the need for and impact of additional doctors on the hospital's staff and patients." *Ibid.*

The judicial understanding of the public role of a hospital is firmly supported by considerations of public policy. The Legislature itself has expressly declared in the Health Care Facilities Planning Act (Facilities Act), *N.J.S.A.* 26:2H–1 to –52, that "hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." *N.J.S.A.* 26:2H–1. Through the Facilities Act, the State exerts extensive supervisory and regulatory control over hospital functions. *See N.J.S.A.* 26:2H–5(b). The breadth and depth of this regulatory jurisdiction reflect and illustrate the State's profound concern with public health care.[3] Governmental respon-

---

[3]The regulatory policy statement of the Commissioner of Health demonstrates the pervasiveness of the State's regulatory concern:

> The Commissioner, to implement the provisions and purposes stated above, shall have the power to inquire into the accessibility to and availability of health care services and the operation of health care facilities and to conduct periodic inspections of such facilities with respect to the fitness and adequacy of the premises, equipment, *personnel, rules and bylaws* and the adequacy of financial resources and sources of future revenues.

[*N.J.A.C.* 8:33–1.3(b) (emphasis added).]

Administrative jurisdiction extends to hospital ownership, *N.J.A.C.* 8:31–26.1, and hospital administration. *N.J.A.C.* 8:43B–2.1, 2.2. Administrative regulations also cover the provision of hospital services, *N.J.A.C.* 8:43B–1.11(q), and the standards for conducting major services or departments. *See N.J.A.C.*

sibility over public health care also extends to the construction, expansion, modernization, or addition of health care facilities, services, or plans. *See N.J.S.A.* 26:2H–7. Any new medical facilities must be genuinely needed, efficiently provided, properly utilized and reasonably priced. *See, In Re Kessler Memorial Hosp.*, 78 *N.J.* 564, 573 (1979) (concurring opinion). This includes "any increase in the total number of licensed beds" as well as changes in the use of beds. *N.J.A.C.* 8:33–2.5. *See Irvington Gen. Hosp. v. Department of Health*, 149 *N.J.Super.* 461 (App.Div.1977) (recognizing administrative authority to regulate bed capacities).[4]

■ Further, administrative regulations reflect particular concern over those aspects of health care that relate to patient access to health care facilities as well as institutional personnel policies that can affect patient care.[5] For example, equal access must be assured for low income persons, racial and ethnic minorities, women, handicapped persons, the elderly, and other underserved groups. *See N.J.A.C.* 8:33–2.1(a); *N.J. Ass'n*

---

8:43B–8.1 to –8.44 (obstetrical and newborn services); *N.J.A.C.* 8:43B–9.1 to –9.5 (psychiatric services); *N.J.A.C.* 8:43B–10.1 to –10.10 (pharmeceutical services); *N.J.A.C.* 8:43B–12.1 to –12.3 (pulmonary disease hospitals); *N.J.A.C.* 8:43B–13.1 to –13.3 (long-term care units); *N.J.A.C.* 8:43B–14.1 to –14.3 (mental hospitals); *N.J.A.C.* 8:43B–15.1 to –15.13 (renal dialysis services); *N.J.A.C.* 8:43B–16.1 to –16.7 (nurse-midwifery services); *N.J.A.C.* 8:43B–17.1 to –17.17. (cardiac diagnostic and surgical services).

4As related to St. Barnabas, its 705 licensed beds can be further broken down to 560 medical-surgical, 12 surgical-intensive care beds, 12 cardiac-care beds, 30 psychiatric beds, 36 obstetrical beds and 55 pediatric beds. These beds are not interchangeable and can be re-allocated only by approval of the hospital licensing board. *See N.J.A.C.* 8:33–2.5.

5All the individuals employed by a hospital, from orderlies to doctors, are subject to regulatory supervision. *E.g., N.J.A.C.* 8:43B–5.1 (personal files and policies, training programs); *N.J.A.C.* 8:43B–5.3 (nursing services); *N.J.A.C.* 8:43B–7.1 (medical library service); *N.J.A.C.* 8:31–26.3 (examinations of employees). For example, the medical staff, by regulation, is required to convene and attend at least four annual staff meetings, implement qualification standards for staff privileges, form committees to deal with certain problems, and pass by-laws. *See N.J.A.C.* 8:43B–6.1 to –6.6.

*of Health Care Facilities v. Finley,* 83 *N.J.* 67 (1980) (uphold-ing regulation requiring nursing home to provide a reasonable number of beds to indigent); *see also N.J.A.C.* 8:43B–1.12 (as a condition of licensure, hospitals cannot discriminate on basis of race, creed, sex, etc.). A hospital must be prepared to "offer a range of means by which a person will have access and avail-ability to its service (for example, outpatient services, admission by house staff, *admission by personal physician* )." *N.J.A.C.* 8:33–2.1(a)(4) (emphasis added).[6]

■ Thus, hospitals, though privately owned, are subject to extensive regulation in the public interest. Through licensure, periodic inspections, cost containment, rate regulation, control over physical growth and expansion, including hospital capaci-ty, supervision over internal administration, including profes-sional and non-professional staff, and regulation of provided health-care services, the State has manifested its pervasive concern and responsibility over virtually all aspects of institu-tional health care. Strongly supported by considerations of current public policy, the Court has come to the definitive position that while hospitals have broad discretionary powers in managing their affairs, including the selection of medical staff, their health-care powers are deeply impressed with a public interest and are fiduciary in nature. *Cf. Right to Choose v. Byrne,* 91 *N.J.* 287, 305 (1982) (recognizing high priority accord-ed by New Jersey to preservation of health); Pollock, "State Constitutions as Separate Sources of Fundamental Rights," 35 *Rutgers L. Rev.* 707, 719 (1983) (same). Hospital powers that relate to the quality and extent of hospital health-care facilities

---

[6]The Certificate of Need program provided under the Facilities Act must also be administered so as not to impair access to vital facilities. This is illustrated by *National Nephrology Foundation v. Dougherty,* 138 *N.J. Super.* 470, 475 (App.Div.1976), where the Commissioner granted St. Barnabas a Certificate of Need to operate an intermediate renal dialysis unit on the condition that St. Barnabas would assure full availability of the service to all physicians and patients and effective cooperation with those institutions whose applications had been rejected.

and services must be exercised reasonably for the public good and must genuinely serve public-health objectives, which include the needs of patients, particularly the reasonable opportunity to select physicians and to have adequate access to hospital facilities.

These considerations markedly affect the manner in which a court will undertake to review the validity of a hospital's exercise of its discretionary health-care powers. In light of the specialized and sensitive nature of institutional public health care and the paramount responsibilities and concerns of other branches of government in this area, courts are normally most circumpect when called upon to determine the validity or enforceability of managerial health-care decisions made by a hospital. If a hospital policy decision reasonably serves an evident public-health purpose, it will be sustained, even though it may have a discriminatory effect. We have thus recognized that because an adverse or discriminatory impact upon some individual doctors or class of doctors is inevitable when a closed staff-admissions policy is adopted by a hospital, it will be upheld if the public-health objective is rationally advanced by the hospital's staff admissions policy. *See, e.g., Guerrero v. Burlington County Memorial Hosp.*, 70 *N.J.* 344, 358 (1976) (hospital's rejection of staff privileges for two doctors in order to avoid overtaxing limited emergency facilities upheld as a reasonable and lawful exercise of power because it was "in furtherance of the interest of both the public and the medical profession."). However, if it cannot be shown that a restrictive staff-admissions policy reasonably furthers a legitimate health-care objective, then the policy merely constitutes an unjustified vehicle of discrimination and is invalid.

In reviewing hospital actions courts must also be tolerant and practical in their consideration of the type of factual basis deemed necessary to demonstrate the reasonableness of hospital health-care decisions. Courts must always remain mindful of the intrinsic complexities that abound in the

area of institutional public health care. *See In re Kessler Memorial Hosp., supra,* 78 *N.J.* 564. The contours of the factual foundation necessary to support a hospital health-care determination will turn on the nature of the decision, the context in which it is made, the purposes to be effectuated by it, and the parties, persons and general interests that are directly or indirectly affected by it.

Although many of the rules and guidelines that are applicable to judicial review of administrative agencies would seem as a matter of common sense to be useful in the review of hospital actions, *see Garrow v. Elizabeth Gen. Hosp.,* 79 *N.J.* 549, 558 (1979), hospitals do not exercise governmental authority and consequently need not act with the same formality required of government entities. In *Garrow,* the Court ruled that because hospitals making sensitive quasi-adjudicative staff decisions affecting particular individuals have limited investigative resources, they could base such decisions merely on sufficient reliable evidence, including hearsay, rather than the more exacting "substantial competent credible evidence" standard required of administrative agencies exercising delegated statutory authority. *See also Sussman v. Overlook Hospital Ass'n,* 95 *N.J. Super.* 418 (App.Div.1967) (procedures surrounding staff decisions must be fair, but need not constitute a "trial-type" hearing). When the decision that is subject to judicial review involves the validity of a broad, general hospital policy determination, rather than a particularized, quasi-adjudicative decision in which a general policy is applied in an individual case, even greater informality can be tolerated. A hospital determining broad policy matters should be able to pursue all reasonable means to inform itself and to draw from a wide array of sources to reach an informed decision. *See In re Kessler Memorial Hosp., supra,* 78 *N.J.* 564; *Garrow v. Elizabeth Gen. Hosp., supra,* 79 *N.J.* 549; *cf. Bally Mfg. Corp. v. N.J. Casino Control Comm'n,* 85 *N.J.* 325, 340 (1981) (concurring opinion) (administrative agency in rulemaking proceeding, though affecting individual party, need not adhere to the admin-

istrative procedural and evidentiary requirements applicable in quasi-adjudicative contested cases). Moreover, in contrast to the responsibilities of an administrative agency (*see N.J.S.A.* 52:14B–4; *e.g., Crema v. DEP*, 94 *N.J.* 286 (1983)), a hospital need not provide public notice, conduct formal proceedings, allow general participation, or develop a formal record in support of a managerial determination. Thus, a hospital decision of this character will be viewed favorably if it is reached in the normal and regular course of conducting the affairs of the hospital and is based on adequate information, regardless of form, origin, or authorship, that is generally considered reasonable and reliable by professional persons responsibly involved in the health-care field.

### III.

St. Barnabas' closed-staff hospital admissions policy can be viewed as a general policy decision made in the regular course of conducting the hospital's affairs. The inquiry therefore is whether there was an adequate informational basis to support the adoption of this closed-staff policy, particularly the inclusion of the criterion that creates an exception for applicants joining the private practice of a doctor already on the hospital's medical staff. If that policy, and its exception, genuinely serve a health-care objective as demonstrated by reasonable and reliable information, it must be upheld.

The hospital asserts that an extremely high rate of bed occupancy, in addition to over-utilization of its equipment and facilities, necessitated a limitation of the number of physicians with staff privileges; it decided to limit hospital staff privileges through the use of a closed-staff policy. The extent of overcrowding, and the gravity of the situation, was disputed.[7]

---

[7]The evidence indicates that in the years from 1972 to 1982 the hospital admitted 351 medical doctors to its staff. There was also, according to the hospital, attrition of doctors due to death and relocation during this period, the

However, even accepting the bed-occupancy rates alleged by Dr. Desai, there were certainly reasonable grounds for the hospital to take some steps in anticipation of imminent over-crowding. The information that was adduced in the record sufficiently indicates that initiation of some type of closed-staff policy was not an unreasonable action to deal with these problems.

The record also indicates that the hospital had adequate information to support its determination, and the trial court's finding, that the endoscopy rooms at St. Barnabas, while not entirely occupied, were sufficiently crowded to warrant a continuation of the hospital's closed-staff policy. Accordingly, we uphold the court's finding below that the hospital was reasonable in adopting a general policy decision that limits or closes access to its regular professional medical staff and to the endoscopy facilities in particular. *See Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84 (1974).

■■■ The hospital's authority to adopt a closed-staff policy does not resolve whether the exception to the closed-staff policy granting preference to doctors associating themselves in private medical practice with doctors already on staff is itself reasonably necessary to achieve a public health-care objective consistent with the goals of the hospital's closed-staff policy. The exception not only has an obvious discriminatory impact on medical doctors, such as Dr. Desai, it also limits the options

---

actual number of doctors on staff dropping from over 700 to approximately 675. Dr. Desai argues that the bed–occupancy rate at the hospital peaked in 1975 at 87 per-cent and had fallen to 82 per-cent in 1981. The hospital contends they were "well over 90 per cent." Dr. Desai also states that the "actual" utilization rate for the endoscopy rooms was between 47 per-cent and 73 per-cent on an annual basis. In addition, he points out that the rooms are normally used only Monday through Friday between 7:30 a.m. and 3:30 p.m. The hospital responds that the last minute cancellations and emergencies diminish the statistical utilization rate and that because many G.I. procedures require fasting or coordination with other medical services, overbooking would harm the quality of care.

available to their patients. Patients of Dr. Desai who live near St. Barnabas, and consequently would like to be treated at St. Barnabas by Dr. Desai, must either go to St. Barnabas under the care of a St. Barnabas affiliated doctor, or remain under the care of Dr. Desai at a more remote location. Although excess demand at particular hospitals unavoidably results in the health care desires of some members of the public not being satisfied, a policy that systematically excludes the patients of one doctor, or one class of doctors, must be closely examined to assure that it reasonably advances the public welfare.

The record amply supports the trial court's finding that this exception, association with a current staff member, is "the obviously most important single factor" governing medical staff admissions and that this "is certainly true of the gastroenterology department." Dr. Echikson, president of the medical staff of St. Barnabas, admitted that to his knowledge no staff applicant who was joining the private practice of a physician on staff has ever been turned down when applying for staff privileges. The record further discloses that of the eight doctors who were admitted into the gastroenterology section of the hospital after the inception of the closed-staff policy in 1969, seven joined the private medical practices of doctors already on staff. Two gastroenterologists, Dr. Mogon and Dr. Green, were actually admitted to the staff after Dr. Desai had been rejected. Dr. Mogon was joining the private medical practice of Dr. Sloan, a doctor already on the hospital's staff.[8] The trial court's determination on this point is clearly supported by the record. *See Rova Farms Resort v. Investors Ins. Co., supra,* 65 *N.J.* at 484.

The hospital argues that there are public health objectives for granting some preference for doctors who are joining

---

[8]Dr. Green was not joining the private medical practice of anyone on staff but it was alleged by Dr. Desai that Dr. Green was granted an exception to the "closed-staff" policy because he would be instrumental in negotiating a merger agreement with Overlook Hospital.

the private medical practice of doctors already on staff. They are: such doctors will be able to help cover the hospital patients of those doctors with existing staff privileges, and their admission would not have an adverse effect on the hospital's occupancy or utilization rate since they are unlikely to require many new patient admissions to the hospital.

We conclude that the information relied on by the hospital, adduced mostly by way of evidence in the trial below, was not sufficient to demonstrate a public-health objective genuinely served by this exception. The ostensible public health purpose of this exception is pure supposition, with the hospital offering no data, competent evidence, or other reliable information to support its rationale. There was no demonstration as to the regularity of doctors in the same private practice covering each other's patients; the hospital failed to show that doctors in the gastroenterology section could not arrange to cover for one another in the case of an emergency. It offered no information to support its position that new doctors, by joining the existing practices of current medical staff members, would not continue to increase the number of patients seeking access to the hospital. These informational deficiencies render insufficient the public-health purpose urged by the hospital in support of its exception that permits admission-by-association. We are thus left only with the discriminatory feature of this exception, with no public-health palliative advanced to blunt its invidious effect. In a similar vein, the Court observed in *Guerrero v. Burlington County Memorial Hosp., supra,* 70 *N.J.* at 358, that

hospitals may [not] routinely deny staff privileges to doctors moving into an area. Any denial of such privileges, if motivated by a desire to exclude newcomers in order to maintain the status quo of the staff, would not be judicially tolerated. Implicit in our opinion in *Falcone v. Middlesex County Medical Society,* 34 *N.J.* 582, 597 (1961) is the belief that the power to exclude must be reasonably and lawfully exercised in furtherance of the interest of both the public and the medical profession. A denial predicated upon exclusionary policies fostering only the well-being of those staff members who are already admitted would clearly be in derogation of the spirit of *Falcone.*

The hospital staff-admissions policy exception that accords favorable consideration to applicant doctors joining the private

practice of doctors already on the hospital staff arbitrarily discriminates against qualified applicants who do not seek or cannot arrange for such associations. This exception has crossed the line of reasonableness and must be invalidated.

## IV.

Plaintiff makes the additional claim that St. Barnabas's closed staff policy violates both the "restraint of trade," *N.J.S.A.* 56:9-3, and "monopolization" proscriptions of the New Jersey Antitrust Act, *N.J.S.A.* 56:9-4(a). He asserts that he is entitled to substantial monetary damages because of these statutory violations.

Dr. Desai's primary contention is that defendant's conduct constitutes a *per se* restraint of trade violation, apparently under a "concerted refusal to deal" or "group boycott" theory. Federal interpretations of the Sherman Act inform our evaluation of this claim. *See N.J.S.A.* 56:9-18; *Monmouth Chrysler-Plymouth, Inc. v. Chrysler Corp.*, 102 *N.J.* 485, 494 (1986); *State v. Lawn King, Inc.*, 84 *N.J.* 179, 192 (1980). In *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, —— *U.S.* ——, 105 *S.Ct.* 2613, 86 *L.Ed.*2d 202 (1985), the defendant, a wholesale purchasing cooperative, expelled the plaintiff from participation. Because the wholesale cooperative was not a form of concerted activity that facially would always or almost always be anticompetitive, the Supreme Court declined to apply the *per se* condemnation rule. The Court held that the rule of reason applies to the actions of wholesale cooperatives, unless the cooperative possesses market power of exclusive access to an essential element of effective competition. *Id.* at ——, 105 *S.Ct.* at 2620, 86 *L.Ed.*2d at 213.

Hospital staffing decisions warrant similar consideration. Hospital-doctor associations are not inherently anticompetitive, and, like wholesale cooperatives, "seem to be designed to increase economic efficiency and render markets more, rather than less, competitive." *Id.* at ——, 105 *S.Ct.* at 2620, 86 *L.Ed.*

2d at 212. *See* Havighurst, "Doctors and Hospitals: An Antitrust Perspective on Traditional Relationships," 1984 *Duke L.J.* 1071, 1128 (1984). The Supreme Court has recognized the special characteristics of the health care industry, holding that a tying arrangement between a hospital and a group of anesthesiologists, unlike other tying contracts, does not warrant *per se* invalidation absent proof of market power. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 *U.S.* 2, 104 *S.Ct.* 1551, 80 *L.Ed.*2d 2 (1984). Moreover, the *Hyde* decision reflects the Supreme Court's general reluctance to apply strict *per se* rules—*i.e.*, those requiring no proof of market power—to unfamiliar practices and businesses. *See, e.g., Northwest Stationers v. Pacific Stationery, supra,* —— *U.S.* ——, 105 *S.Ct.* 2613, 86 *L.Ed.*2d 202 (wholesale cooperatives); *cf. Goldfarb v. Virginia State Bar*, 421 *U.S.* 773, 787 n. 17, 95 *S.Ct.* 2004, 2013 n. 17, 44 *L.Ed.*2d 572, 585 n. 17 (1975) (antitrust concepts born and nurtured in the business world may not be automatically applicable to the professions).

We have been similarly hesitant to endorse *per se* antitrust rules. *E.g. Monmouth Chrysler-Plymouth, Inc. v. Chrysler Corp., supra,* 102 *N.J.* 485. In *Belmar v. Cipolla, supra,* 96 *N.J.* 199, we reviewed a New Jersey Antitrust Act challenge to a hospital-anesthesiologist exclusive contract. Although the Court did not have to choose between the *per se* approach, which the Supreme Court had used in an identical context, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde, supra,* 466 *U.S.* 2, 104 *S.Ct.* 1551, 80 *L.Ed.*2d 2, and the rule-of-reason methodology, the Court noted that "the rule of reason test is particularly appropriate when, as here, we are confronted with a novel and complex issue with which New Jersey courts have had little experience." *Id.* at 219.

Since closed-staff policies such as St. Barnabas' have not been previously examined or addressed under the New Jersey Antitrust Act by New Jersey courts, they might be more appropriately judged under the rule-of-reason test. As in *Bel-*

*mar*, it is unnecessary to decide which antitrust test governs hospital privilege decisions. In this case, plaintiff has not adduced any proofs regarding market area or market power. Plaintiff's bare allegations of lost-patient referrals constitute all the evidence mustered in relation to the antitrust claim. The failure to offer sufficient proofs on this issue requires dismissal of the antitrust claim.[9]

## V.

By way of conclusion, we determine that the closed-staff policy, including most of the various exceptions to it, are valid. However, the exception that permits favorable consideration of medical doctors who became associated in the practice of a current member of the hospital's medical staff does not genuinely serve a public-health objective and is invidiously discriminatory in its application. This exception cannot be sustained as reasonable on this record.

Since it is not entirely clear from the record whether Dr. Desai would have been successful in securing admission to St. Barnabas' hospital staff in the absence of this exception, we remand Dr. Desai's application to the hospital for reconsideration in light of this opinion. However, the association-exception appears to be the critical, if not the sole, factor barring Dr. Desai from the hospital's professional medical staff. Moreover, no one questions Dr. Desai's medical qualifications. Consequently, unless Dr. Desai possesses a disqualifying characteristic not revealed in this record, we expect that the hospital will grant Dr. Desai staff privileges.

Accordingly, the judgment below is reversed.

---

[9]Because of our disposition on the merits, we make no determination on defendant's argument that St. Barnabas is exempt from the New Jersey Antitrust Act pursuant to the statutory exemption for "bona fide religious and charitable activities of any not for profit corporation, trust or organization established exclusively for religious or charitable purposes...." *N.J.S.A.* 56:9–5(b)(5).

*For reversal*—Chief Justice WILENTZ and Justices CLIF-
FORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For affirmance*—None.