

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-1997

# Schulz v. US Boxing Assn

Precedential or Non-Precedential:

Docket 96-5200,96-5239

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Schulz v. US Boxing Assn" (1997). *1997 Decisions.* Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 96-5200 and 96-5239
_____


AXEL SCHULZ; CEDRIC KUSHNER PROMOTIONS, LTD.;
DER FIRMER SAUERLAND PROMOTION, A.G.;
WILFRIED SAUERLAND

v.

UNITED STATES BOXING ASSOCIATION; INTERNATIONAL BOXING
FEDERATION, a Division Thereof; FRANCOIS BOTHA; MICHAEL MOORER,

Francois Botha,
          Appellant in 96-5200

United States Boxing Association and International Boxing
Federation,
          Appellant in 96-5239


_____


On Appeal from an Order
of the United States District Court
for the District of New Jersey
Granting a Preliminary Injunction

D.C. No. 96-1076
_____


Argued October 30, 1996

Before:  SCIRICA and COWEN, <u>Circuit Judges</u>,
       and POLLAK, <u>District Judge</u><sup>*</sup>

(Filed January 24, 1997)


_____

* Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Eckley M. Keach (argued)
Oscar B. Goodman
Goodman, Chesnoff & Keach
520 South Fourth Street
Las Vegas, Nevada 89101

Rosemary Alito
McCarter & English
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
  Attorneys for Botha

Walter R. Stone (argued)
Adler, Pollock & Sheehan, Inc.
2300 Hospital Trust Tower
Providence, Rhode Island 02903

Linda P. Torres
Carpenter, Bennett & Morrissey
Three Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
  Attorneys for United States Boxing Association
  and International Boxing Federation
Joel J. Reinfeld (argued)
171 East Ridgewood Avenue
P.O. Box 297
Ridgewood, New Jersey  07451
  Attorney for Appellees in 96-5200

Jay Goldberg, P.C.
250 Park Avenue, 14th Floor
New York, New York  10177
  Attorneys for Appellees in 96-5239

Patrick C. English (argued)
Dines & English
685 Van Houten Avenue
Clifton, New Jersey  07013
  Attorneys for Appellee Moorer

_____

OPINION OF THE COURT
_____

POLLAK, District Judge.

This case involves a court's authority to order a private organization that sponsors prizefights to strip a champion of his title. Defendant Francois Botha defeated plaintiff Axel Schulz in a fight for the International Boxing Federation (IBF) heavyweight championship. Botha then tested positive for use of steroids. After a hearing, the IBF declined to disqualify Botha, allowing him to retain his IBF crown. Schulz sued and the district court issued a preliminary injunction mandating that the IBF disqualify Botha. Botha, the IBF, and the IBF's parent United States Boxing Association (USBA) now appeal the grant of the preliminary injunction.

## I.  Background

Three major bodies regulate and promote the sport of professional boxing:  the World Boxing Association, the World Boxing Council, and the International Boxing Federation with its parent United States Boxing Association. Each of these organizations classifies boxers by weight class, ranks the boxers within each class, and, for a participation fee, sponsors -- or "sanctions" -- both championship and non-championship bouts. The IBF was formed to provide a mechanism through which the United States Boxing Association, a national organization, could crown world champions. According to its literature, the IBF was organized "by representatives of various athletic commissions and other interested persons for the purpose of obtaining greater efficiency and uniformity in the supervision of professional

boxing and to encourage and assist professional boxing."  App.
274.

The IBF has promulgated a set of rules and regulations
governing IBF-sanctioned bouts.  Rule 20, entitled "Anti-doping,"
requires boxers to provide a urine specimen after each fight to
be tested for, among other substances, anabolic steroids and pain
killers.  This rule adds that "[s]hould that specimen prove
positive, disciplinary action will follow."  App. 284.  In

addition, Rule 26, entitled "Penalties," provides as follows:
Should anyone be found in violation of the rules and
       regulations of the IBF or USBA by any Committees
       impaneled by the President, they may be subject to
       fine, forfeiture of monies, vacation of title or any
       other discipline directed by the Committee and approved
       by the President for the good of the organization.

App. 291.

On December 9, 1995, Francois Botha of South Africa fought
Axel Schulz of Germany in Stuttgart for the vacant IBF
heavyweight championship.  Before the bout, each fighter paid the
IBF more than $45,000 in "sanctioning fees" and other fees.  Each
boxer's representative also signed a document entitled "Rules for
IBF/USBA & Intercontinental Championship Bouts" ("Bout Rules").
 The Bout Rules were also signed by Robert W. Lee, president of
the IBF/USBA, and by a representative of the local boxing
commission, the German Boxing Federation.  The Bout Rules begin
by stating that "[t]he Championship fight will be governed by the
rules and regulations of the IBF/USBA and local Boxing Commission
. . . ."  App. 83.  The Bout Rules then set out four pages of

2

detailed requirements.  The last of these is entitled "Anti-

Doping" and reads as follows:

Each boxer is required to take a urinalysis immediately
following the bout.  Said specimen must be taken with a
Ringside Physician and Commission Inspector on hand.
The specimens should be taken in a plastic container
and properly marked by the physician and boxer.  It
should be divided into two parts for each boxer, with
bottles [sic] #1 being submitted to the laboratory.
Should either boxer's specimen be positive for drugs,
etc., all parties will be notified and another test
made at a laboratory selected by the boxer and the
local Commission.  Should that specimen prove positive,
disqualification and disciplinary action will follow.
Specimens will be tested for the following drugs:

There follows a list that includes anabolic steroids and pain

killers.  App. 87.

An identical "Anti-doping" rule appears in an IBF/USBA

document titled "Ring Officials Guide and Medical Seminar

Outline."  This Guide's introduction states that "[t]he major

purpose of this Ring Officials Guide is to establish criteria to

be followed in all IBF/USBA boxing matches so that uniformity in

actions, responsibilities, duties and total performance of ring

Officials can be attained . . . ."  App. 65.

In the Stuttgart fight, Botha defeated Schulz in a split

decision to win the IBF heavyweight championship.  Each fighter

then gave a urine specimen.  Botha's specimen was sent to a

German laboratory, where it tested positive for anabolic

steroids.  In accord with the anti-doping Bout Rule, Botha was

then allowed to choose where the sample would be tested a second

time; his choice, the UCLA Olympic Analytical Laboratory, also

3

found anabolic steroids in his urine.  During this period, Botha vigorously denied using steroids.

The German Boxing Federation -- the local boxing commission that signed the Bout Rules -- recommended on February 15, 1996 that the IBF disqualify Botha and that Schulz be designated IBF world champion.  The Federation also barred all the boxers, promoters, referees, and trainers whom it licensed from taking part in Botha's bouts for two years.

On Saturday, February 24, 1996, upwards of two months after the Stuttgart bout, the IBF held a hearing in Elizabeth, New Jersey, to determine what action would be taken as a result of the positive steroid tests.[1]  The hearing was conducted by the IBF's Executive Committee and its subcommittee, the Championship Committee; the Championship Committee was to make a recommendation to the Executive Committee, which had final authority.  All persons having an interest in the outcome of the Botha/Schulz bout were notified of the hearing and given an opportunity to be heard.  The committees heard testimony from Botha, from his attorney and two of his doctors, and from representatives of Schulz, the German Boxing Federation, and Michael Moorer.

Moorer was at the time a former IBF and World Boxing Association heavyweight champion.  In September 1995, Moorer had

---

1.  Presumably the hearing was held in New Jersey because the IBF's principal place of business is in that state.

sued the IBF in federal court in New Jersey over the IBF's rankings, seeking to block the Botha/Schulz bout because, he argued, he was entitled to fight next for the title. A settlement agreement signed later that month provided that Moorer would dismiss his action in return for a guarantee that he would, within 180 days of the Botha/Schulz bout, fight the winner for the IBF title. At the IBF's February 24, 1996 hearing, Moorer's counsel reminded the IBF of its agreement with Moorer.

Botha's testimony at the hearing was a surprise: he admitted for the first time that he had taken the drug found in his urine. He argued, however, that he had not known that what he took was a steroid. Botha stated that he had injured his arm in 1988 and his South African doctor had given him two prescriptions for the pain and swelling. In March 1995, after Botha had moved to California, his South African doctor had sent him a third medication for his continuing arm stiffness, which was the steroid (Deca Durabolin) that turned up in his urine. (There is a good deal of controversy about the steroids' possible impact on Botha's capacity as a fighter, but the controversy -- the main elements of which are summarized in the annexed footnote[2] -- does not appear to bear upon the issue before this

---

2.    At its February hearing, the IBF heard testimony from two of Botha's California doctors -- neither of them pharmacologists -- that the drugs had no effect on the outcome of the fight.
    The principal evidence that the drugs prescribed for Botha were taken in a deliberate attempt to increase his muscle mass is an affidavit of Dr. Robert Voy, an expert in drug use by athletes. This affidavit, submitted by Moorer's counsel, was not before the IBF at its hearing but was before the district court

court, namely the appropriateness of the district court's
preliminary injunction.)

After hearing all the testimony, the IBF Championship and
Executive Committees recessed to deliberate.  When they returned,
IBF President Robert W. Lee announced the IBF's decision:
> We will not vacate the title of Francois Botha.  There
> are mitigating circumstances which cause us to feel
> that we should not vacate the title of Francois Botha.
>
> However, what we will do is we will fine Francois Botha
> in the amount of $50,000 for having taken these
> substances into his system that were in violation of
> our rules.
> Secondly, we will order a rematch between Francois
> Botha and Axel Schulz to take place within 180 days of
> today or not later than August 24, 1996.
> Thirty days prior to that fight taking place Francois
> Botha must give a urinalysis to show that he no longer
> has these substances in his system.
> The winner between Francois Botha and Axel Schulz will
> be obliged to fight Michael Moorer within 120 days of
> the date that they fight . . . .

App. 210-11.[3]  This announcement triggered vehement protests in

---

at the preliminary injunction hearing.  The affidavit provides
the following information:  The two drugs prescribed for Botha in
South Africa were anabolic steroids.  Botha's use of the two
steroids together indicates that they were taken in a fashion
known as "stacking,"  which is a technique to prevent
"aromatization," a process by which the body rids itself of the
drugs.  This technique is used only by experienced steroid users
to enhance their performance.  Finally, Deca Durabolin -- the
only steroid found in Botha's urine -- has very few legitimate
medical uses; it does not, for example, relieve pain.  No
evidence was presented to the district court that Botha had any
of the conditions that would indicate legitimate use of the
steroid.

3.  At the hearing, the IBF did not explain the "mitigating
circumstances" that led it to decline to disqualify Botha.  After
this suit was initiated, IBF President Lee stated in a
"certification" submitted to the district court that the
mitigating circumstances were:  (1) that the steroid was
prescribed by a doctor for a 1988 injury; (2) that Botha admitted

6

the hearing room, but, after some wrangling, the hearing was adjourned with the IBF's decision unchanged.

Over the weekend, however, the members of the IBF Executive Committee conferred over the phone. On Monday, February 26, the Executive Committee issued an amended ruling in writing, stating that its members had not previously given sufficient consideration to the IBF's commitment to Moorer.[4] The amended ruling preserved the $50,000 fine against Botha but restructured the scheduled fights: Moorer would challenge Botha for the title before June 9, 1996, with Schulz to fight the winner of this bout within 120 days.

Schulz, together with his promoters Cedric Kushner Promotions and Der Firmer Sauerland Promotion, and his manager Wilfried Sauerland, brought suit in the District of New Jersey, naming the USBA and IBF as defendants, with Botha and Moorer joined as necessary defendants because their rights were affected. Moorer filed a counterclaim and crossclaim seeking specific performance of his settlement agreement with the IBF.

---

taking the medication but denied knowing that it was a steroid; (3) that Botha exhibited none of the typical signs of prolonged steroid use; (4) that the Executive Committee believed the steroid use did not appear to have affected the outcome of the fight; (5) that Botha had ceased taking the medication; and (6) that the championship should, in the Committee's view, be decided in the ring rather than on the sidelines. App. 298.

4. Moorer apparently relied on the settlement agreement with the IBF, refusing a match with George Foreman that would have earned him $2.7 million in order to be available for his title bout with the winner of the Botha/Schulz fight. App. 340.

7

The district court had jurisdiction pursuant to 28 U.S.C. § 1332.[5]

After a hearing, the district court found that Schulz and his co-plaintiffs had met the criteria for preliminary injunctive relief.[6] On March 29, 1996, the court accordingly ordered that (1) the USBA and IBF "amend their decision of February 26, 1996 so as to disqualify Francois Botha"; (2) Moorer and Schulz "proceed to a bout prior to June 9, 1996 as set forth in the September 19, 1995 settlement agreement" between Moorer and the USBA and IBF; (3) the USBA and IBF "determine the consequences of the order with respect to the ratings of the various boxers in conjunction with the IBF rules"; and (4) plaintiffs post a $100,000 bond.

The IBF/USBA and Botha separately appeal the issuance of the preliminary injunction, which Schulz and Moorer seek to have

---

5. Plaintiffs Schulz and Sauerland are citizens of Germany, Cedric Kushner Promotions, Ltd. is incorporated and headquartered in New York, and Der Firmer Sauerland Promotion, A.G., is incorporated and headquartered in Switzerland. Defendant Botha is a South African citizen living in California. Defendant Moorer is citizen of Florida. The USBA is incorporated in Michigan and headquartered in New Jersey. The IBF, originally a voluntary non-profit corporation organized under the laws of Rhode Island, became a for-profit Oregon corporation in 1986; its headquarters are in New Jersey.

6. In district courts within this circuit, "[i]n order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm. Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest." Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1175 (3d Cir. 1990).

upheld.  This court has jurisdiction pursuant to 28 U.S.C. §
1292.  A motions panel of this court denied the IBF's motion for
a stay and Botha's motion for an expedited appeal.

On June 22, 1996, Moorer and Schulz fought the bout mandated
by the preliminary injunction.[7]  Moorer won, regaining the IBF
championship belt.  On November 9, 1996 (some ten days after the
argument of this appeal), Moorer fought Botha, successfully
defending his title with a twelfth-round TKO.

## II.  Analysis

We review a district court's ruling on a preliminary
injunction to determine if there has been an abuse of discretion,
an error of law, or a clear mistake of fact.  See Louis Vuitton
v. White, 945 F.2d 569, 574 (3d Cir. 1991).  In this appeal, the
parties dispute whether the district judge was correct in finding
that Schulz and his co-plaintiffs (hereinafter "Schulz") were
likely to succeed on the merits of their claim.  No party
challenges the district court's findings regarding irreparable
harm or the effect of the injunction on third parties and the
public interest.

### A.

Without discussing specific precedents, the district court
summarized the law governing this case as follows:

---

7.  "Moorer Beats Schulz to Reclaim IBF Crown," Phila. Inquirer,
June 23, 1996, at D3.

9

We are dealing here with a private association, albeit one in which the public has a substantial interest. Under New Jersey law a private association has the right to adopt, administer and interpret its internal regulations and is granted substantial deference when judicial review is sought. When, however, an association departs from its own prescribed procedures, or where its actions are in total violation of its own rules and regulations, a court will intervene to protect the property rights and other substantial interests of those who are subject to its rules.

. . .

The critical question is whether the IBF violated its rules when it failed to disqualify Botha for his drug use.

App. 533-34.

After reviewing the Bout Rules and the IBF rules and regulations, the district court concluded:

It is abundantly clear to me that IBF and USBA have established a policy that has been made crystal clear to the boxers who fight under their aegis that no boxer is to take the drugs proscribed in the rules, and that if a boxer does take such drugs he will be disqualified regardless of what other disciplines may be imposed. The broad general language which appears in Rule 26 cannot trump the unmistakably clear language of the Bout Rules which the IBF and the boxers sign and the Ring Officials Guide which IBF and USBA promulgate. It is hard to imagine how the two organizations can adopt any other policy if they were to retain the confidence of the public and the fighting profession.

App. 536-37. On this basis, the district court concluded that Schulz had a high likelihood of succeeding on the merits.

B.

With the opinion of the district court as predicate, we proceed to examine whether the court had the authority to set aside the IBF's decision not to disqualify Botha. As the court properly observed, the courts of New Jersey (and like courts in

10

other jurisdictions) will ordinarily defer to the internal decisions of private organizations.  Indeed, "[c]ourts have been understandably reluctant to interfere with the internal affairs of [private] associations and their reluctance has ordinarily promoted the health of society."  Falcone v. Middlesex County Medical Society, 170 A.2d 791, 796 (N.J. 1961).[8]

1.

In Rutledge v. Gulian, 459 A.2d 680 (N.J. 1983), the New Jersey Supreme Court identified the limited occasions when a court may set aside the determinations of private organizations regarding discipline of their members.[9]  Rutledge was a former

8.  All parties agree that New Jersey law applies to this action challenging a decision made at a hearing held in New Jersey by the IBF, which is headquartered in New Jersey.  Indeed, the IBF's rules and regulations specify that in litigation involving the activities of the IBF, "the laws of the State of Rhode Island and/or New Jersey shall apply."  App. 285.  (As previously mentioned, the IBF was originally incorporated in Rhode Island. See supra note 5.)

9.   The district court and the parties have treated this case as one involving judicial intervention in the affairs of a private voluntary organization.  Within this framework, Rutledge controls our decision in this case.  We observe, however, that the IBF is more than simply a voluntary social association:  it is a profit-making corporation which wields substantial economic power over the careers of boxers fighting under its aegis.  Moreover, as the district court noted, the public has a substantial interest in the IBF's actions and in its integrity.  The judicial interest in protecting those who may be detrimentally affected by an organization like the IBF is greater than the judicial interest in protecting members of purely social organizations.  Indeed, New Jersey's courts have a long tradition of intervening to protect the rights of those affected by organizations which possess near-monopoly power or which strongly affect the public interest.  See, e.g., Matthews v. Bay Head Improvement Ass'n, 471 A.2d 355, 367-68 (N.J.) (holding that a beachfront association's limitation on membership to borough residents violates public policy), cert. denied, 469 U.S. 821 (1984); Moore v. Local Union

11

Grand Master of a Masonic Grand Lodge who had been found guilty of misappropriation of lodge funds by a Masonic trial panel under the Masonic Code for Trials.  A successor Grand Master suspended operation of the Code for Trials procedures by which the local lodge would ordinarily have imposed punishment, ordering instead that a special "Lodge of Judgment" convene to determine Rutledge's punishment.  Rutledge challenged the Masons' unwillingness to discipline him according to their established procedures.

The Rutledge court began by setting out the applicable standard:

> In Higgins v. American Soc'y of Clinical Pathologists, 51 N.J. 191, 238 A.2d 665 (1968), this Court analyzed judicial intervention into the affairs of a private organization as follows:  (1) does the plaintiff have an interest sufficient to warrant judicial action, and (2) has that interest been subjected to an unjustifiable interference by the defendant?

459 A.2d at 682.

In examining the first prong, the court concluded that Rutledge's "status, attributable to membership in a prestigious,

---

No. 483, Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers, 334 A.2d 1, 5-6 (N.J. 1975) (requiring a union to reconsider plaintiff's application for membership fairly and reasonably); Falcone, 170 A.2d at 799-800 (striking down a medical society's membership requirement of four years' attendance at an A.M.A.-approved medical college as violative of public policy).  Cf. New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 650 A.2d 757, 768, 775-777 (N.J. 1994) (recognizing a state constitutional right to distribute political leaflets at a privately-owned regional shopping center, "the functional equivalent of yesterday's downtown business district"), cert. denied, 116 S. Ct. 62 (1995).

12

socially-active fraternity, merit[ed] protection from unreasonable discomfiture." Id. at 683.[10]

With respect to the second prong of the test articulated in Higgins, the Rutledge court concluded that an organization subjects a plaintiff's interest to "unjustifiable interference" in either of two circumstances: when the organization's conduct is driven by principles that violate public policy, or when the procedures employed by the organization offend principles of fundamental fairness. 459 A.2d at 683-84; see also Brounstein v. American Cat Fanciers Association, 839 F. Supp. 1100, 1110-12 (D.N.J. 1993) (summarizing the Rutledge test). The Rutledge court determined that, although Rutledge's membership in the Masons was an interest that merited judicial protection, the convening of the Lodge of Judgment did not violate either public policy or fundamental fairness.

2.

Following the Rutledge test, and undertaking to assess the issues as of the time the district court issued its preliminary injunction, we must therefore ascertain, first, whether Schulz

_____

10. In addition to membership interests in social organizations, courts following New Jersey law have also protected a member's economic and status interests in belonging to a professional society, see Higgins v. American Society of Clinical Pathologists, 238 A.2d 665, 670 (N.J. 1968) (protecting plaintiff's interest in certification as a medical technologist), and in retaining a professional license, see Brounstein v. American Cat Fanciers Association, 839 F. Supp. 1100, 1110 (D.N.J. 1993) (protecting plaintiff's interest in a license to judge cats).

13

had "an interest sufficient to warrant judicial action," and --
if the answer to the first question is in the affirmative --
second, whether "that interest [was] subjected to an
unjustifiable interference" by the IBF.  In considering the first
prong, we observe that Schulz's status in the boxing community,
as well as his public reputation, were clearly affected by the
IBF's decision not to disqualify Botha.  In addition, although
Schulz would not have become the champion on Botha's
disqualification,[11] he had an economic interest in being declared
the winner of his bout with Botha.[12]  We therefore conclude that
Schulz had an interest in the IBF's decision sufficient to
warrant judicial action.[13]

### 3.

In determining whether Schulz's interest was "subjected to
an unjustifiable interference" by the IBF, we must inquire

---

11.  The IBF's Rule 10 provides that a champion loses his title
if he is disqualified, but a losing challenger does not thereupon
become champion; rather, the title becomes vacant.  Schulz and
Botha were fighting for the title vacated by George Foreman when
he retired, so both boxers had the status of challenger.

12.  The winner of the Botha/Schulz fight would next fight Moorer
for the vacant title.  Although the purse split between a
champion and a challenger is usually negotiated, if the parties
cannot agree the IBF holds a "purse bid" with the champion
receiving 75% of the total bid and the challenger receiving 25%.
 See IBF Rule 23, App. 285.  Hence it was financially more
advantageous for Schulz to fight for a vacant title, with a
background norm of a 50/50 purse split between the two
challengers, than to challenge a champion.

13.  The interests of Schulz's co-plaintiffs in this action --
his manager and his promoters -- are derivative of Schulz's
interest and likewise merited protection.

whether the IBF's refusal to disqualify Botha violated either
public policy or fundamental fairness.  If the refusal offended
either of these principles, then the Rutledge standard was met
and judicial intervention was warranted.

We turn first to public policy.  The Rutledge court made
clear that public policy on its own can justify judicial
protection of a plaintiff's interests.[14]  In determining New
Jersey public policy, we turn to the enactments of the state
legislature as an authoritative source.  See Higgins, 238 A.2d at
671 ("The grant of a license to a laboratory director found by
the State Board of Medical Examiners to be qualified in
compliance with [N.J.S.A. 45:9-42.1 et. seq.] evinces a
legislative policy determination that the operation of
bioanalytical laboratories by qualified non-doctors, as well as
by physicians, is in the public interest."); see also Desai v.
St. Barnabas Medical Center, 510 A.2d 662, 666-67 (N.J. 1986).[15]

14.  The court cited two examples of unreasonable interferences
based on principles violating public policy.  In Higgins, the
court struck down as violative of public policy a rule of the
American Society of Clinical Pathologists forbidding its members
to associate with a laboratory not run by a licensed physician.
See 238 A.2d at 671.  In Zelenka v. Benevolent and Protective
Order of Elks, 324 A.2d 35, 37 (N.J. Super. Ct. App. Div.), cert.
denied, 331 A.2d 17 (1974), the court held that the Elks' ban on
its members publicly criticizing the organization's racial
restrictions violated public policy.

15.  In Desai, the court reasoned that

[t]he judicial understanding of the public role of a
     hospital is firmly supported by considerations of
     public policy.  The Legislature itself has expressly
     declared in the Health Care Facilities Planning Act . .
     .  that "hospital and related health care services of

15

The New Jersey legislature has declared, as "the public policy of [the] State," that

> it is in the best interest of the public . . . that boxing . . . should be subject to an effective and efficient system of strict control and regulation in order to . . . [p]romote the public confidence and trust in the regulatory process and the conduct of boxing . . . .

N.J. Stat. § 5:2A-2. Moreover, the regulations of the state Department of Law and Public Safety implementing this statute also evince a purpose to instill public confidence in the sport. Cf. Desai, 510 A.2d at 667 (relying in part on agency regulations to ascertain New Jersey's public policy). The Department's 1995 proposal for readoption of its regulations noted that "[t]he rules in this chapter have helped New Jersey be recognized as a leader in the area of boxing regulation" and observed that a primary purpose of the rules was "furthering the trust and confidence of the public." 27 N.J.R. 2096 (June 5, 1995).

Both the legislative and executive branches of the New Jersey state government have, therefore, made it clear that they consider it to be the public policy of the state to inspire the

---

> the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." . . . Through the Facilities Act, the State exercises extensive supervisory and regulatory control over hospital functions. . . . The breadth and depth of this regulatory jurisdiction reflect and illustrate the State's profound concern with public health care.

510 A.2d at 666-67 (citations omitted).

"trust and confidence" of the citizenry in boxing.  The public's confidence that the outcome of a prizefight is fair rests squarely on the assumption that the result was not improperly influenced -- by illicit equipment,[16] by gifts,[17] or by the involvement of managers convicted of crimes of moral turpitude.[18]

The regulations of the state Department of Law and Public Safety also make clear that "the public confidence and trust" in boxing are promoted by banning the use of substances that can affect a boxer's performance.  See N.J. Admin. Code tit. 13:46 § 12.3(a) (1995).  The regulations provide that "[t]he use of any drug . . . by a boxer either before or during a match, shall result in the immediate disqualification of the boxer from the match and indefinite suspension from boxing."  Id.

This express statement of public policy by New Jersey's political branches is mirrored in the Bout Rules that the IBF drafted and required the pugilists to sign before the Stuttgart

16.  See N.J. Admin. Code tit. 13:46 § 3.3 ("In all bouts, the gloves shall be inspected by the Commissioner's inspector and the ringside physician prior to the fight.")  The gloves must also be placed on the boxer's hands under the supervision of the inspector.  See id.

17.  See N.J. Admin. Code tit. 13:46 § 23A.4 ("No appointee [of the State Athletic Control Board] shall solicit, receive or agree to receive . . . any gift, favor, service or other thing of value whatsoever . . . .").

18.  See N.J. Admin. Code tit. 13:46 § 6.18 ("A license of any manager shall be suspended for an arrest for or revoked on a conviction of any offense in this or any other jurisdiction which would be under New Jersey law a crime of moral turpitude or any other offense which indicates that licensure would be inimical to the conduct of the sport of boxing in this State.").

fight.[19]  Given the strength of New Jersey's public policy, we concur in the district court's observation that the IBF could not have established a less demanding protocol.  See supra at 10.  Of course, the bout took place not in New Jersey but in Germany; however, to the extent we have any information regarding the policy of the fight venue, we observe that the German Boxing Federation not only recommended that Botha be disqualified for his steroid use, but banned all persons whom it licenses from participating in Botha's bouts for two years.

New Jersey has adopted an express policy of promoting the public trust and confidence in boxing, and has specifically mandated disqualification of boxers who use drugs.  The IBF itself has adopted, and reaffirmed shortly before the contest at issue here, an identical rule mandating disqualification for drug use.  The public's trust and confidence in boxing is undermined if one of the sport's major sanctioning bodies flouts its own

_____

19.  We agree with the district court that the mandatory disqualification language in the Bout Rules takes precedence over the IBF's rules and regulations.  The Bout Rules contain both specific language that "disqualification will follow" and general language that the IBF regulations apply.  It is well established that within a particular document containing conflicting specific and general provisions, the specific provisions control.  See, e.g., Wilson v. Unsatisfied Claim and Judgment Fund Board, 536 A.2d 752, 756 (N.J. 1988).  In addition, the Bout Rules specifically govern the Botha/Schulz fight in Stuttgart, whereas the rules and regulations are generic.  Again, where two sources of law conflict, familiar rules of construction dictate that the more specific controls over the more general.  See, e.g., New Jersey Transit Corporation v. Borough of Somerville, 661 A.2d 778, 782 (N.J. 1995).

rule which comports with the state's public policy.[20]  We conclude, at this preliminary stage, that the IBF's failure to disqualify Botha likely violated New Jersey's public policy.

4.

We now return to the standard for judicial intervention in the workings of a private organization, as set forth in Rutledge.  Under that standard, a reviewing court should invalidate a private organization's decision affecting a plaintiff's interest only if (1) the plaintiff's interest is sufficient to warrant judicial action, and (2) that interest has been subjected to an unjustifiable interference by the defendant -- that is, violates public policy or fundamental fairness.  We have determined that Schulz's interest in the IBF's decision merited judicial protection and that the IBF's decision likely violated public policy as expressed by New Jersey's legislature and executive branch.  Therefore, at this preliminary stage, both elements of the Rutledge test were met, and judicial intervention was warranted.[21]

---

20.  The district court made an identical finding:  "Protecting the integrity of a sport in which there is wide interest is important.  The reputation for integrity is threatened if there is a rule against drug use but the organization permits the fighter to retain a victory notwithstanding that use."  App. 539.

21.  Because we decide this case on the basis of the "public policy" prong of the Rutledge test, we need not reach the question whether the IBF's decision not to disqualify Botha was a violation of "fundamental fairness."
    The IBF/USBA's argument that the district court's preliminary injunction exceeded the court's authority is without

19

C.

We note, finally, that this case might have been decided on alternate grounds. The district court did not address whether the Bout Rules constitute a contract, and none of the parties has briefed this question in any detail. Rather, almost all argument has centered on whether the IBF violated its own internal rules and, if so, whether a court may then intervene to mandate that the IBF disqualify Botha. Because this case is still at a preliminary stage, however, we think it appropriate to point out that the Bout Rules themselves may well be deemed a contract, and that application of contract law may therefore constitute an independent basis for the district court's decision.

> As the New Jersey Supreme Court has stated:
> A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' . . . Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.

Weichert Co. Realtors v. Ryan, 608 A.2d 280, 284 (N.J. 1992) (citations omitted). Of course, "[n]o contract is enforceable .

_____

merit. In ordering the fight between Schulz and Moorer, the court did not "unwittingly set the purses for the fighters for future bouts." IBF/USBA Br. at 22. The IBF's settlement agreement with Moorer mandated that Moorer's fight with the winner of the Schulz/Botha bout be for the IBF title. It is this agreement, and not the district court's order enforcing it, that may have set the purses for future bouts. Moreover, the parties agreed at the preliminary injunction hearing that if Botha were disqualified, Schulz would fight Moorer. App. 528.

20

. . without the flow of consideration -- both sides must 'get something' out of the exchange." Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc., 459 A.2d 1163, 1171 (N.J.), cert. denied, 464 U.S. 994 (1983) (citations omitted).

The Bout Rules were signed by representatives of Botha and Schulz as well as the IBF and the German Boxing Federation; the signatures manifested an intention to be bound by these rules. The provisions of the Bout Rules were definite, so that "the performance to be rendered by each party can be ascertained with reasonable certainty." Each party's agreement to abide by the Bout Rules provided consideration for the other parties' agreements. Moreover, each boxer's payment of more than $45,000 for the privilege of fighting under the IBF's aegis constituted additional consideration for the IBF's agreement to enforce the Bout Rules. And, as we have seen, the Bout Rules expressly provided that, if one of the boxers violated the anti-doping rule, that boxer would be disqualified.

Therefore, it appears likely that application of the law of contract to this case would yield a result identical to that reached in the main body of this opinion.

### III.  Conclusion

The district court was correct in finding that Schulz was likely to prevail on the merits, and therefore appropriately granted the preliminary injunction ordering the IBF, in

21

accordance with its own rules, to disqualify Botha.

For the reasons stated, the judgment of the district court is affirmed.